**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GUY TURI & MELISSA BALISTRERI -** | ) | **Hon.:** |
| **TURI, SHAUN NUGENT &** | ) | |
| **CHRISTINE DENTON, LISA & SAM** | ) | **Case No.:** |
| **WELLS**, **LINDA & GEORGE WOOD,** | ) | |
| **KELLEEN & TODD URBON** | ) | |
| Individuals | ) | **PLAINTIFFS** |
| Plaintiffs | ) | **COMPLAINT FOR VIOLATIONS** |
| | ) | **OF:  18 U.S.C. §§ 1341, 1343,** |
| v. | ) | **18 U.S.C. § 1962(c)** |
| **MAIN STREET ADOPTION** | ) | **18 U.S.C. § 1962(d)** |
| **SERVICES, LLP** | ) | -**UNJUST ENRICHMENT,** |
| a Pennsylvania For Profit Corp. | ) | - **CONVERSION,** |
| and | ) | -**CIVIL CONSPIRACY,** |
| **NINA HELLER, BOB McCLENAGHAN** | ) | - **FRAUDULENT** |
| and | ) |   **MISREPRESENTATION,** |
| **MARCIA DEL CARPIO a/k/a** | ) | - **INNOCENT** |
| **MILAGRO DEL CARPIO** | ) |   **MISREPRESENTATION.** |
| individuals | ) | -**INTENTIONAL INFLICTION** |
| | ) |  **OF EMOTIONAL DISTRESS,** |
| **Jointly and Severally** | ) |  -**NEGLIGENT INFLICTION OF** |
| Defendants | ) |   **EMOTIONAL DISTRESS** |
| | ) | |
| | ) | **PLAINTIFFS DEMAND A JURY** |
| | ) | |

---

**Joni M. Fixel**  (P56712)
**Fixel Law Offices, PLLC**
Attorneys for Plaintiffs
4084 Okemos Rd, Ste B
Okemos, MI 48864
jfixel@fixellawoffices.com
(517) 332-3390  phone
(517) 853-0434  fax

*John S. Tucci Jr., Esquire*
 Marshall, Dennehey, Warner, Coleman & Goggin
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
jstucci@mdwcg.com
Tel:215/575-2616
Fax: 215/575-0856

---

Guy Turi and Melissa Balistreri-Turi, Shaun Nugent and Christine Denton, Lisa and Sam Wells, Linda and George Wood, Kelleen and Todd Urbon ("Plaintiffs") hereby allege and state the following Complaint against Defendants Main Street Adoptions, LLP, Nina Heller, Bob McClenaghan and Marcia (Milagro) Del Carpio (hereinafter referred to collectively as "Defendants").

## <u>PARTIES</u>

1.      Plaintiffs Guy Turi and Melissa Balistreri-Turi are United States citizens residing in the State of Illinois.

2.      Plaintiffs Shaun Nugent and Christine Denton are United States citizens residing in the State of Minnesota.

3.      Plaintiffs Lisa and Sam Wells are United States citizens residing in the State of Louisiana.

4.      Plaintiffs Linda and George Wood are United States citizens residing in the State of Illinois.

5.      Plaintiffs Kelleen and Todd Urbon are United States citizens residing in the State of Illinois.

6.      Defendant Main Street Adoption Services, LLP ("MS") is a Pennsylvania For-Profit Corporation with a principal place of business at P.O. Box 4691, Lancaster Pennsylvania, 17604.

7.      Defendant Nina Heller ("NH") is upon information and belief a United States citizen residing in the State of Pennsylvania. NH held herself out to be the Chief Executive Officer of MS, its President and a Director and an expert in International Adoptions.

8.      Defendant Bob McClenaghan ("Defendant BM") is upon information and belief a United States citizen residing in the State of Pennsylvania. BM held himself out to be a Director of MS and an expert in International Adoptions.

9.      Defendant Marcia Del Carpio a/k/a Milagro Del Carpio ("MD") is upon information and belief a United States citizen residing in the State of Florida. MC held herself out to be an expert in Guatemalan adoptions.


## JURISDICTION AND VENUE

10.     This action is brought under the Federal Racketeer Influenced and Corrupt Organization ("RICO") statute, 18 U.S.C. § 1961 et seq., and various other Pennsylvania statutes and common law doctrines.  The matter in controversy exceeds the sum or value of Seventy-Five Thousand and 00/100 Dollars ($75,000.00), exclusive of interest and costs, and is between citizens of different states.  Jurisdiction is vested in this Court by virtue of 28 U.S.C. §§ 1331 and 1332.

11.     Because claims brought under Pennsylvania law are also so related to Plaintiffs' federal claims, over which the Court has original jurisdiction, that they form part of the same case or controversy under Article III of the United States Constitution, the Court also has jurisdiction over Plaintiffs' Pennsylvania common law and statutory claims pursuant to 28 U.S.C. § 1367.

12.      A substantial part of the events and omissions giving rise to the claims stated herein occurred in this District and all defendants are subject to the personal jurisdiction of this judicial district. Venue is proper in this District and Division pursuant to 28 U.S.C. §§ 1391 and to 18 U.S.C. §1965(b).

## BACKGROUND ALLEGATIONS

**Guy Turi & Melissa Balistreri-Turi**

14.  On or about February 28, 2007, Guy Turi and Melissa Balistreri-Turi ("Plaintiffs") found an 11 month old girl on an internet adoption site, www.precious.org and sent an inquiry about the little girl, Gilda. The agency, Defendants MS & NH, responded that the child was "taken". (**See Exhibit A**)

15. On or about Friday, April 6, 2007, Plaintiffs received an unsolicited email from the Defendants asking if they might be interested in an 18 month old little girl, Madeline Araceli Rodriguez Dardon ("Madeline"). Plaintiffs filled out the on line questionnaire to let the Defendants know that they were interested in adopting Madeline. Defendants sent a contract by email immediately and told the Plaintiffs that they would need to fax the contract and get the initial deposit to the Defendants by the next Monday.

16.  On or about Monday, April 9, 2007, the Plaintiffs told Defendants that as soon as the Defendants provided medical reports for review and the reports were acceptable, Plaintiffs would wire the money to the Defendants.  (**See Exhibit B**)

17. Plaintiffs were assured by Defendants that they would receive monthly medical reports and photographs of Madeline. These assurances were one of the reasons that the Plaintiffs felt comfortable contracting with the Defendants. Defendants' website stated the complete adoption process would only take 5 months. To further assure the Plaintiffs, the Defendants sent several email addresses of alleged satisfied adoptive parents. Plaintiffs did wire the $3,000.00 deposit to Defendants.

18. On or about June 20, 2007, the DNA was completed and it was a match between the BM and Madeline. Defendants then demanded the next fees due which was $9,500.00 or they would not be allowed to visit their little girl. Plaintiffs paid the fees.

19. On or about July 17, 2007, Plaintiffs sent an email to Defendants to remind the Defendants that they were going to Guatemala to visit Madeline so they would be there for the child's second birthday. They asked for Defendant MD's telephone number as she was the facilitator for the adoption. Plaintiffs also asked for an updated medical report and new photos. The only medical report they had seen was the original in April and the only photos were sent in May.  (**See Exhibit C**)

20.  Defendant NH assured the Plaintiffs that Defendant MD would be bringing Madeline to the hotel to visit the Plaintiffs. (**See Exhibit D**)

21. On or about July 21 -27, 2007, the Plaintiffs traveled to Guatemala to visit their little girl Madeline. While the Plaintiffs waited in the lobby of the hotel waiting for their little girl to be brought to visit them, they began to worry when no one showed up with the child. Eventually, Defendant MD called the Plaintiffs and told them that the birth mother had reclaimed her child **11 (eleven) days before the Plaintiffs traveled to Guatemala**.

22. The Plaintiffs were heartbroken, devastated and appalled when Defendant MD offered "another baby girl" for the Plaintiffs. The Plaintiffs declined the obvious bait and switch baby offer.

23. On or about July 26, 2007, the Defendants called the Plaintiffs at the hotel and asked if they would consider meeting another little girl who was approximately 1 year 8 months old. The little girl's name was Maite Oossmarli Ramirez Jimenez ("Maite"). Cautiously and reluctantly, the Plaintiffs agreed to meet Maite. The Plaintiffs fell in love with little Maite.

Defendants assured the Plaintiffs that Maite had not been offered or matched with any other family.

24. After the Plaintiffs returned to home, the Defendants tried to discourage the Plaintiffs from accepting the referral of Maite. Instead Defendant NH wanted the Plaintiffs to accept a referral for a baby girl. Defendant NH admitted that she didn't have any infant girls at that time but she "**could obtain one in 2-4 weeks."** First the Plaintiffs were asked to wait for two (2) weeks to see if Madeline's mother would change her mind. After two (2) weeks, the Plaintiffs signed a Power of Attorney ("POA") to begin the adoption of Maite. During this time Defendant NH repeatedly tried to get the Plaintiffs to change their adoption once again to a baby girl. Plaintiffs refused since they had already met with and bonded with Maite.

25. On or around August 17, 2007, the Plaintiffs were told that it was the birth father that had returned to put his name on Madeline's birth certificate, making her not eligible for adoption because she was no longer considered an orphan by the United States standards.

26. On or about October 4, 2007, the Plaintiffs were asked by the Defendants to pay for the DNA of Maite to begin the adoption process of Maite. Even though the Plaintiffs had already paid $9,500.00 to the Defendants earlier than required by contract, the Defendants insisted that the Plaintiffs pay for the DNA test. (**See Exhibit E**)

27. Maite's adoption entered Procoduria Nacional de Guatemala ("PGN") (equivalent to the Attorney General's Office) for approval of the adoption.

28. Defendants requested that the Plaintiffs pay foster care fees for December and January for Maite. Even though the Plaintiffs were not required by contract to pay foster

fees until after January, they paid the fees to ensure Maite was well cared for in the foster home.

29. On or about December 3, 2007, Defendant BM advised Plaintiffs that Maite adoption case had been kicked out of PGN for a previo (error that needed to be corrected or legal reason to deny the adoption). At that time he claimed he didn't know the reason for the previo but would let them know as soon as the case was resubmitted.

30. In December 2007, Plaintiffs begged the Defendants for pictures of Maite because they had never received any of her and hadn't seen her since July. The Plaintiffs wanted to assure themselves that she was fine. Defendants never responded.

31. On or about January 15, 2008, Plaintiffs were advised that Maite adoption case had been kicked out of PGN for a previo (error that needed to be corrected or legal reason to deny the adoption). The reason for the previo was that the birth father's name was on Maite's birth certificate. The Plaintiffs found out that this birth father had added his name on October 30, 2007. (**See Exhibit F**)

32. When Plaintiffs questioned Defendant NH how this could have happened, Defendant NH told Plaintiffs not to jump to conclusions but that they needed to ask Defendant MD for details.

33. On or about January 19, 2008, Plaintiffs demanded answers from the Defendants and a full accounting of where the over $25,000.00 sent to the Defendants had been spent. (**See Exhibit G**)

34. When Plaintiffs demanded that Maite's case be registered with the Central Authority in Guatemala, Defendants admitted that the child had been returned to her father. (**See Exhibit H**)

35. Plaintiffs continued communicating with all of the Defendants and it was clear that Defendants NH and BM knew that Defendant MD was performing questionable adoption practices while in Guatemala and it was part of the adoption practice for these Defendants. (**See Exhibit I**)

36. On February 1, 2008, the Defendants wrote to the Plaintiffs stating that they were sure that they could now get Madeline back for the family. (**See Exhibit J**)

37. On or about February 8, 2008, the Defendants wrote to the Plaintiffs to tell them that they were now working on the adoption of Maite. (**See Exhibit K**)

38. On or about February 18, 2008, Defendant BM assured Plaintiffs that he was going to work independently to complete her adoption.

39. On or about February 13, 2008, Defendant NH assured Plaintiffs that the case was registered with the CNA (required to complete the adoption). (**See Exhibit L**)

40. On or about April 25, 2008, after Defendants NH and BM's constant reassurances that they were working on getting Maite's adoption approved, the Defendants finally admitted that the adoption would never be completed. In a callous attempt to market yet another child, Defendant NH offered the Plaintiffs an adoption from Ethiopia. Plaintiffs promptly asked for proof that the Defendants could competently complete an adoption in Ethiopia but never received any proof from the Defendants. Plaintiffs declined to work with the Defendants on any more adoptions. (**See Exhibit M**)

41. Plaintiffs were induced into an adoption where the Defendants involvement clearly became baby bait and switch programs. The Defendants repeatedly provided false information and their unethical behavior, lack of monitoring and misrepresentations

induced the Plaintiffs into the adoptions. Plaintiffs have been damaged financially and
emotionally by the Defendants illegal activities.

**Plaintiffs  Shaun Nugent and Christine Denton**

42. Shaun Nugent and Christine Denton ("Plaintiffs") contacted Defendants on or about
November 4, 2006 to discuss adopting a sibling group, Julian and Estella, from Guatemala
that was on www.precious.org. The Plaintiffs were given the referral (matched as
prospective adoptive parents to the orphaned child(ren)). The Plaintiffs were paper ready
(all homestudy and approvals were completed to begin an adoption).  Defendant NH (aka
Nina Vizitel) e-mailed the Plaintiffs information on how much money to send to the agency
and gave the impression of a sense of urgency to wire the money before the children were
no longer available. (**See Exhibit N**)

43. On or about December, 2006, Defendants emailed Plaintiffs to advise them that the
birth mother refused to have a DNA test, so the adoption of Julian and Estella could not be
completed. The children had been put into an orphanage and were no longer adoptable.
Plaintiffs asked to get their money back but the Defendants told them it would be a problem
because **"we aren't exactly sure where it went but we will put it toward another**
**adoption in Guatemala for you."** The Defendants assured the Plaintiffs that this type of
situation had never occurred before.

44. On or about January 7, 2007, Defendants offered another referral to the Plaintiffs.
This child was Maria Elena Oliva Marroquin. Plaintiffs quickly accepted this referral and
made plans for Maria to be their daughter. Defendants told the Plaintiffs that Maria was 2

years old and that she may have scoliosis. Later Plaintiffs found out that Maria was closer to 4 years old and healthy. (**See Exhibit O**)

45. On or about March 31, 2007, Plaintiffs traveled to Guatemala to visit Maria and begin the family bonding process.

46. On or about April 1, 2007, the Plaintiffs were met at the lobby of the hotel and Plaintiff Christine is told that they can keep Maria with them overnight and she can travel with them to Antigua.

47. On or about April 2, 2007, Maria's foster mother left paperwork at the hotel with the Plaintiff that allowed the Plaintiff to become the foster parent of Maria. Plaintiffs had previously asked the Defendants for the same paperwork but were advised that the Defendants had never had a family that wanted to foster parent before so they had never completed such a document.

48. On or about April 7, 2007, Plaintiff Christine moved into Chosen Children's House to begin fostering her daughter while Plaintiff Shaun flew home. Plaintiff Christine arranged for Maria to begin pre-school.

49. Pursuant to the Guatemalan adoption laws, the birth mother must be interviewed prior to relinquishing the child for adoption. Maria's birth mother was scheduled for her interview on April 9, 2007 but didn't show up for the interview.

50. On or about April 15, 2007, Maria's former foster parents, Wiliam and Ana Maria Lopez, and the three Lopez children and Byron arrived unexpectedly at Plaintiff Christine's home and told her that she needed to appear for the court interview the next morning. The Plaintiff called Hector (Defendant's representative) to verify. Apparently neither Hector or the Defendants NH or BM had knowledge of this court interview. The foster family

10

claimed that they had been searching and had finally found the birth mother, who lived one hour away from Guatemala City. Defendants had previously told the Plaintiffs that the birth mother lived 12 hours away from Guatemala City.

51. On or about April 16, 2007, the Plaintiff and Maria appeared for the court appointment and interview. The birth mother, Vidalia, did appear for the interview that day. Wiliam, Hector and Byron (Defendants representatives in Guatemala) appeared to be in charge of the proceedings that day.

52. The DNA test to assure that the birth mother was indeed the parent of the child was scheduled for April 17 or 18, 2007. On or about April 18, 2007, the Plaintiffs were called by Hector who advised them that the birth mother, Vidalia, was not the "legal mother" of Maria and that the case would have to be investigated by the Defendants. Plaintiffs were told by Hector "**something went wrong but you need to stay in town to discuss."** Plaintiffs also received many calls from the foster family wanting to discuss the problem with the adoption. Plaintiffs frantically called Defendants (who had not even been in contact with the foster family or Hector) and were finally told by Defendants that **"the birth mom was a prostitute from El Salvador who died when the child was 15 days old**. **The lady posing as her mother took on her care because the birth mother didn't have family."**

53. According to Guatemalan laws, the death of the birth mother would require the little girl Maria to become an abandonment case not a relinquishment case.  At this time the Plaintiffs became very uncomfortable using the Defendants for their adoption as they had already experienced two failed DNA tests with the Defendants. Defendants told the Plaintiffs that they could not help them as they had never processed an abandonment case

before. The Defendants gave the Plaintiffs the name of an attorney, Sara Dreyfuss, in Guatemala who could assist them with the abandonment case. In another attempt to bait and switch, the Defendants offered to give Plaintiffs another referral for another child.

54. Hector called Plaintiff Christine and told her not to talk to anyone or tell the real story or "***she could be hurt.***"  He told the Plaintiffs that the foster family would tell anyone who asked that some lady was their maid and one day just left leaving the child with the foster family. Plaintiff Christine told Hector how she disagreed with all of his plans.

55. On or about April 26, 2007, Defendants sent the Plaintiffs an email advising that if they didn't move forward with Sara Dreyfuss in 24 hours, they wanted to be released from the case and would no longer be responsible. Plaintiff Shaun Nugent had met with Sara Dreyfuss who had never met the Defendants or spoken to them. Plaintiffs were not comfortable with this attorney or her orphanage environment.

56. On or about April 27 2007, Plaintiffs met with new attorneys about the adoption. These attorneys advised them that Defendant MS was still responsible for the case and could not just "drop it". Plaintiffs hired these attorneys to complete the adoption process of little Maria.

57. On or about May 7, 2007, Plaintiffs attorneys were able to get the Plaintiffs temporary custody of Maria Elena.

58. Plaintiffs wrote to the Defendants several times to request their dossier back but they were told by Defendant NH that she would not give it to them until they disclosed where they were living and who the new attorney was on the case. Defendant NH demanded copies of all of the new documents proving that the Plaintiffs had temporary custody of

Maria. Plaintiffs felt that their safety was at risk and advised Defendants to communicate through their new legal team.  (**See Exhibit P**)

59. On or about May 26, 2007, Defendant MD gave the original dossier to the Plaintiffs.

60. On or about June 10, 2007, Defendant MD called the Plaintiffs and asked for 2,000 Quetzals to pay for travel expenses for Vidalia (birth mother) because Maria's "**birth mother**" needed to appear in court on June 17, 2007 (which was a Sunday when courts are not open). Plaintiffs told Defendant MD "No!" and advised their new legal team of the call. When asked about the date, Defendant MD changed the date to June 18, 2007. Plaintiffs were no longer working with the Defendants so there was no reason for Defendants to contact or seek money from the Plaintiffs. (**See Exhibit Q**)

61. On or about June 18, 2007, Plaintiffs appeared with their legal team and Maria at Family Court. Vidalia appeared claiming again to be the child's birth mother and that she was voluntarily relinquishing Maria. She claimed to know the Plaintiffs (who had only seen her once in a parking lot) and Maria didn't appear to even recognize Vidalia. This time the PGN contact didn't appear and the hearing had to be rescheduled to July 2, 2007.

62. On or about July 2, 2007, Plaintiffs went to the Family Court hearing but this time the PGN official and Vidalia didn't appear. A new date was set for August 13, 2007. After meeting with the legal team, the Plaintiffs agreed that if the PGN official didn't appear to the next hearing it was time to begin the abandonment adoption process.

63. On or about August 13, 2007, the PGN attorney appeared to Family Court regarding the case of Maria Elena. The judge in Family Court ordered Maria to begin living in a hogar (equivalent to U.S. orphanage). Broken hearted, the Plaintiffs search for a place to

live near the hogar where Maria was placed. Plaintiffs observe developmental regression of Maria after placement in the hogar.

64. A new date for Family Court is set for September 11, 2007 but no one from PGN appears and no family appears. But on September 27, 2007, Maria Elena was officially declared an abandonment adoption case. On or about October 9, 2007, the official Certificate of Abandonment was issued with Vidalia still on record as Maria's mother.

65. On or about December 12, 2007, U. S. Embassy Officer Roma advised the Plaintiffs that he could not issue pre-approval on Maria's case because of conflicting stories. He said he would need one month to investigate.

66. On or about December 28, 2007, Plaintiffs received an email from Officer Roma containing a Notice of Intent to Deny ("NOID") from the U.S. Embassy.

67. On or about January 4, 2008, Plaintiffs spoke again with Officer Roma about Maria's case. Officer Roma said that Vidalia admitted under oath that she is not the birth mother and he had no choice to deny the adoption. He did say that he would keep the adoption case open until the Plaintiffs had time to obtain documents stating that the birth mother and father were unknown.

68. On or about January 29, 2008, Plaintiffs received the official NOID. The rebuttal for the NOID was due on February 29, 2008. Plaintiffs asked for and received an extension to rebut the NOID. Plaintiffs had to rebut the NOID by March 28, 2008. Later due to delays in getting a new birth certificate issued for Maria, the rebuttal had to be extended again until May 2008.

69. Due to Maria's background being unknown, forensic tests were ordered to determine her actual age. The forensics test uncovered that Maria's real age was 5 years, 9 months.

14

70. On or about May 6, 2008, the judge in Maria's adoption case received the forensics and Police reports that would allow the new birth certificate to be issued.

71. On or about May 27, 2008, Maria's new birth certificate was issued but there was a typographical error, so a new birth certificate needed to be ordered.

72. On or about May 28, 2008, the rebuttal to the NOID was submitted to the Embassy with the new (corrected) birth certificate.

73. On or about June 17, 2008, the U.S. Embassy issued pre-approval for Maria Elena.

74. As of August 2008, the Plaintiffs have been financially injured over $170,702.00 trying to complete the adoption of Maria. These costs are over and above the original adoption fees. Plaintiff Shaun Nugent had to quit his job ($250,000.00 per year) to attend the many court appointments. Plaintiff Christine first took a leave of absence to complete the adoption but was later told to resign from her job of $98,000.00 per year as a project manager. The list of expenditures does not even take into account the lost wages. (**See Exhibit R**)

75. Plaintiffs were induced into an adoption where the Defendants failed to complete the adoption and had a duty to know that the child(ren) were really available for adoption. The Defendants repeatedly provided false information and their unethical behavior, lack of monitoring and misrepresentations delayed the adoption. Plaintiffs have been damaged financially and emotionally by the Defendants illegal activities.

**Plaintiffs Lisa and Sam Wells**

76. Lisa and Sam Wells ("Plaintiffs") contacted the Defendants on or about August 28, 2007 to inquire about adopting a little girl, Kimberly, from Guatemala. Defendants

encouraged the Plaintiffs to send $6,000 immediately to cover expenses and to ensure that they were "assigned" the little girl.  (**See Exhibit S**)

77. Throughout the next few weeks, the Plaintiffs checked with the Defendants to find out when the DNA test would be completed for Kimberly and were told various excuses throughout the month of October. (**See Exhibit T**)

78. On or about November 1, 2007, Defendant NH sent an email to the Plaintiffs explaining that the birth mother was missing and the DNA couldn't be done. The email offered to find another child for the Plaintiffs but went on to boast about how the agency had paid the extra fees without passing it on to the Plaintiffs. Defendant NH even challenged the Plaintiffs to fly to Guatemala if they didn't believe the information they were provided. (**See Exhibit U**)

79. On or about November 6, 2007, Defendant NH wrote that once again the birth mother didn't show up and they were "done" with the birth mother. She did say **"We have a set of twins coming in. They are under two months old. We do not have any more info then that. We cannot place them together because we do not have family wanting to adopt two kids…."** (**See Exhibit V**)

80. When Plaintiffs asked about possibly checking on another baby offered by other agencies, Defendant BM emailed the Plaintiffs and told them that they wouldn't get the price reductions from other agencies that they were offered from Defendant MS. (**See Exhibit W**)

81. On or about December 1, 2007, Plaintiff Lisa Wells wrote Defendants demanding to know if the adoption of Kimberly was moving forward or not. Defendant BM discouraged

the Plaintiff from continuing the adoption of Kimberly for several reasons. Even then, the Defendants continued the adoption process.  (**See Exhibit X**)

82. Later in December the Plaintiffs signed a Power of Attorney to adopt one of the babies that Milagro had told the Plaintiffs had become recently available.

83. On or about January 17, 2008, Defendant MD demanded money to be sent immediately for a translator for the adoption of Kimberly. (**See Exhibit Y**)

84. On or about February 11, 2008, Plaintiffs began working with Dr. Rubio (pediatrician and obstetrician) to complete baby, Enma Leeann Ramirez Martinez' adoption. Dr. Rubio assured the Plaintiffs that he had good control of the birth mother and could help complete the adoption.  (**See Exhibit Z**)

85. In March 27, 2008, Plaintiffs wrote to the U.S. Immigration Service, Adoptions Unit to inquire whether they had any record of the adoption pre-approval. The US Adoptions Unit emailed the Plaintiffs that the DNA results had been received on February 5, 2008 but an update on the adoption pre-approval should be completed by no later than April 5, 2008. (**See Exhibit AA**)

86. On or about April 12, 2008, the Plaintiffs received an update from the US Adoptions Unit advising the family that their I71-H was approved for only one child. The records at the Adoptions Unit showed two open adoptions – one for Kimberley Orodonez Lopez and one for Emma Leeann. The Plaintiffs needed to fax a letter to the Adoptions Unit telling the government that they were no longer adopting Kimberly. The Plaintiffs sent the letter immediately to clarify the adoption situation. (**See Exhibit BB**)

87. On or about April 14, 2008, the Plaintiffs were sent a Notice of Birth Mother interview for the adoption of Emna Leann. (**See Exhibit CC**)

88. Apparently during the same week, Defendant BM made a complaint to the U.S. Embassy about the Plaintiff's adoption case and the fact that Defendant MD and Dr. Rubio were involved in the adoption. When Defendant MD confronted Defendant NH about the complaint and that Defendant MD couldn't travel to Guatemala due to the complaint, Defendant NH responded "**You problem".** (**See Exhibit DD)**

89. When the birth mother didn't appear for the required Embassy interview, the Plaintiffs once again became concerned and were trying to reach either Dr. Rubio or Defendant MD.

90. On or about May 20, 2008, Plaintiffs frantically tried to discuss the issue with Dr. Rubio. The Plaintiffs wanted to know when Milagro was bringing the birth mother to the Embassy. Plaintiffs told Dr. Rubio that they would file a complaint with the Embassy if he could not resolve the problems between Milagro and him. Dr. Rubio said he didn't care and **"I am not wasting one more penny for you."** And with that note, Dr. Rubio stopped working on the adoption.(**See Exhibit EE)**

91. Because of the fight between Defendants NH, BM and Defendant MD, the Plaintiffs still have not completed the adoption of their baby, Emma Leeann. The Plaintiffs have been the victims of multiple and constant requests for money, a bait and switch adoption scheme and various other illegal acts.

92. Plaintiffs were induced into an adoption where the Defendants did absolutely nothing to complete the adoptions. The Defendants repeatedly provided false information and their unethical behavior, lack of monitoring and misrepresentations delayed the adoptions. Plaintiffs have been damaged financially and emotionally by the Defendants illegal activities.

**Plaintiffs Linda and George Wood**

93. Linda and George Wood (Plaintiffs) became paper ready and were approved to adopt internationally. On or about January 18, 2007, the Plaintiffs went on line and found the picture of a little girl, Joseline Alexandra De Leon Grijalva, on photo website www.precious.org. After investigating further, they found that she was with the Defendant's adoption agency for placement. Plaintiffs spoke to Defendants at length about a previous referral that had ended and how they were wary to begin another adoption. Defendants assured Plaintiffs that they were working with an excellent attorney and had great associations in Guatemala. Defendants assured Plaintiffs that the DNA had already been completed, so based on the many assurances and representations of the Defendants, the Plaintiffs agreed to begin the adoption of Joseline and contracted with the Defendants.

94. On or about May 14, 2007, the Plaintiff's adoption case received pre-approval and should have been submitted to the PGN. Defendants told the Plaintiffs that the case was submitted to PGN but later the Plaintiffs found out that their adoption wasn't submitted until on or about June 18, 2007. Strangely, the Defendants repeatedly warned the Plaintiffs to stay away from internet chat rooms and adoption blogs.

95. Although there were several discrepancies and stories from the Defendants, the adoption was finally approved by PGN on November 20, 2007.  Defendants phoned Plaintiffs on or about November 21, 2007 to tell them of the PGN approval. During that call the Defendants expressed some concern about the buscadora who was handling the case in Guatemala.

96. On or about November 26, 2007, the Plaintiffs phoned the Defendants who said all was well with the adoption and told them to wire or send the final adoption fees. Once the fees had been paid, the Defendants called and said that they must have been paranoid and all was fine.

97. On or about November 29, 2007, Defendant BM sent the Plaintiffs an email stating that the "wheels in motion to finish the case." (**See Exhibit FF**)

98. After the payment was made, Defendants didn't contact the Plaintiffs for three weeks and then called to tell the Plaintiffs that the birth mother couldn't be found for the final interview and DNA test to complete the adoption. This was strange news to the Plaintiffs as the Defendants had told them several times that the birth mother had already provided final signature on the necessary documents. (**See Exhibit GG**)

99. In early January 2008, Defendants advised the Plaintiffs that they had made no progress in finding the birth mother. The Defendants went on to tell a story about how they suspected the buscadora's in child trafficking. A few days later, Defendants told the Plaintiffs another story about how they were sure that birth mother had changed her mind and was going to reclaim Joseline.

100.     On or about January 7, 2008, the Defendants advised the Plaintiffs *by email* that their baby, Joseline, had been removed from the foster care by the buscadora and given back to the birth mother. The Plaintiffs were devastated and demanded proof that the case had actually progressed as they had been told. The Plaintiffs demanded proof of payments to the various agencies. Defendants didn't respond. (**See Exhibit HH**)

101.     On or about January 16, 2007, Defendant BM wrote that Joseline's grandparents have "entered into the picture." (**See Exhibit II**)

102.     On or about January 17, 2007, Plaintiffs wrote to the Defendants to explain how they had been in the adoption process for a year and how much they loved Joseline. (**See Exhibit JJ**)

103.     On or about January 20, 2008, Plaintiffs called Defendant MD who was staying in Guatemala City. Defendant MD claimed that coincidently she was meeting with the birth mother later that day and would call the Plaintiffs back with an update. Defendant MD called later in the day with another Spanish speaking lady on the phone. Defendant MD translated what appeared to be a well rehearsed conversation with the alleged birth mother telling the Plaintiffs that she wanted to raise her baby. The birth mother repeatedly said that she was reassured that she could change her mind at anytime during the adoption process.

104.     On or about January 21, 2008, Defendant NH wrote to the Plaintiffs, told them the adoption was basically ended and callously offered to help them with a Ukrainian adoption. Defendant NH wrote about the Ukranian adoptions as if switching countries and children were as simple as buying a car from a different dealership. Plaintiffs were rightfully offended and responded on or about January 28, 2008 demanding their fees spent up to that date, $29,200.00,  be refunded. (**See Exhibit KK**)

105.     On or about January 28, 2008, Plaintiffs wrote to Defendants to remind them that even with PGN approval that the adoption was required to be registered with the Central Authority ("CNA") no later than February 11, 2008. Defendants assured the Plaintiffs that it would be done.

106.     On or about February 1, 2008, Plaintiffs received an email stating that Defendant BM was in Guatemala and would contact the Plaintiffs with their options after

he had discussed their adoption case with the "attorneys". Plaintiffs never received another email with any results of the alleged meeting or options.

107.     In March 2008, when pressed for an update by the Plaintiffs, Defendants NH wrote once again telling them that the Defendants representative in Guatemala was still trying to get the birth mother to come in and change her mind. (**See Exhibit LL)**

108.     On or about March 25, 2008, apparently Defendant NH thought that because the Plaintiffs communicated with them again, that she would try one more time to bait the Plaintiffs into another international adoption. This time Defendant NH sent photos of children and was offering an adoption from Russia, Kazakhstan, Bulgaria, Hungary, Kirgizstan, Uzbekistan, Rwanda, Burundi, Ukraine, Nepal and possibly Ethiopia. She even noted that some of these countries were closed "temporarily" but she was still offering to do adoptions in those countries. She was really promoting Burundi and Rwanda adoptions. **See Exhibit MM)**

109.     The Plaintiffs were induced into an adoption that never took place due to the incompetence of the Defendants. Plaintiffs were induced into an adoption that Defendants never intended to complete through Defendants assurances, unethical behavior, lack of monitoring and misrepresentations. Plaintiffs have been damaged financially and emotionally by the Defendants illegal activities.

**Plaintiffs Kelleen and Todd Urbon**

110.     Kelleen and Todd Urbon (Plaintiffs) were parents who had adopted in previous years and were experienced in international adoption. When the Plaintiffs decided to investigate adopting a male toddler, it was done with purpose and careful investigation.

111.     On or about May 23, 2007, Plaintiffs contacted the Defendant's agency to inquire about a boy on a photo listing. This boy's name was Darwin. Plaintiffs made it clear to the Defendants that they were seeking to adopt a boy between 18-24 months old. Defendants advise Plaintiffs that Darwin was no longer available for adoption.

112.     On or about May 24, 2007, Defendants emailed the Plaintiff several photo's of a little boy, Alexander. Defendant NH told the Plaintiffs if they didn't want this little boy she would have to list him on www.precious.org . (**See Exhibit NN**)

113.     Plaintiffs responded that they were interested in little Alexander but needed to see the medical reports and have more information on the boy's background. Defendant NH tells the Plaintiffs that she should have the medicals the next day. Defendant NH tells the Plaintiffs that the birth mother is cooperative and surrendered Alexander and his sisters. The sisters had already been matched with families in Pennsylvania and New Mexico.

114.     Plaintiffs were concerned about Alexander's true age but it was clarified by the Defendants. Defendant NH tells Plaintiffs that there is another family interested in Alexander but the Defendants prefer to place Alexander with the Plaintiffs. (**See Exhibit OO)**

115.     On or about May 31, 2007, Plaintiffs formally accepted the referral match of little boy, Antony Alexander Gullen Lopez. Defendants sent the Plaintiffs the contracts and other paperwork to complete. The Defendants assured the Plaintiffs that the process should only take approximately 7 months to complete. (**See Exhibit PP**)

116.     On or about July 10, 2007, Defendants advise the Plaintiffs that Defendant MD manages the foster moms and will be providing the updates for Alexander. Plaintiffs request updates, photos and medical reports. (**See Exhibit QQ**)

117.     On or about August 3, 2007, Plaintiffs contact the Defendants because there has been no update or contact. Plaintiffs inquire when the DNA is scheduled and when Defendant MD will be traveling to Guatemala.

118.     On or about August 22, 2007, after several attempts to contact the Defendants, the Plaintiffs called Defendant NH's cell phone. Defendant NH told the Plaintiffs that the birth mother had taken Alexander and his sisters out of foster care and left the area. Initially the Plaintiffs were told that the birth mother did it out of fear that the children would be sold for body parts in the United States.

119.     On or around September 10, 2007, Plaintiffs were told by Defendant NH that the birth mother was in jail because she did not have the appropriate documentation for the children when she was stopped by authorities. Defendants told the Plaintiffs that the birth mother wouldn't be released until a DNA test proved that she was the mother of the three children. Defendant NH said that if the DNA cleared and the birth mother relinquished the children, Defendants would reclaim the children from the orphanage and fly them and the birth mother back to Guatemala to complete the adoption. Defendant NH stated that Defendant MD had been in contact with the birth mother and that the birth mother said she would continue with placing her children through Defendant MS.  **(See Exhibit RR)**

120.     On or about September 19, 2007, Defendant NH told the Plaintiffs that a second attorney (not connected with the Defendants) had also filed a petition on behalf of the birth mother. Following contact with this attorney, Defendant NH stated that they believed that the birth mother was trying to place the children with another attorney in order to get money.

121.     As time continued on, the Plaintiffs were assured that the adoption would continue. On or about October 5, 2007, the Defendant NH expressed concern that she now believed some of Alexander's documents might be fraudulent, because a potential adoptive parent of Alexander's sister had discovered photos of Alexander and his two sisters on an another adoption agency website.  Defendant NH admitted that she thought Alexander's adoption was over. Immediately Defendant NH offered another referral of Kelinton Gabriel. The Plaintiffs later turned down this referral as the boy was much younger than what they were seeking.  (**See Exhibit SS**)

122.     On or about October 19, 2007, the Defendants sent the Plaintiffs another referral who is suitable. This boy's name is Edgar and over the next few weeks the Plaintiffs repeatedly ask for medicals, background information and photos for Edgar. They receive medical and limited background information only after Plaintiffs say they will not go forward without this information.

123.     On or about November 14, 2007, Plaintiffs sent the fees for Edgar's DNA test and completed a new Power of Attorney to begin his adoption.

124.     On or about November 26, 2007, Defendants advise the Plaintiffs that Edgar's DNA is a match and that the Plaintiffs will need to send fees soon so that Defendants can keep things moving in Guatemala. The Plaintiffs advise the Defendants that they will give Edgar the name of "Daniel Edgar". (**See Exhibit TT**)

125.     On or about December 2, 2007, Plaintiffs wired $12,000 to the Defendants for the adoption.  $2,500 of that amount was requested over and above usual costs, which Defendants said was necessary to cover the unexpected expenses associated with attempts to assist Alexander's birthmother in jail.  The money was sent via wire transfer.  Despite

several requests for information in the following weeks, Plaintiffs received no further

updates throughout the holidays.

126.        On or about January 11, 2008, the Plaintiffs receive an unexpected notice

from the U.S. government  via email stating that information from the doctor to support the

adoption of Daniel Edgar has not been received.  If it is not submitted the US government

will consider that Plaintiffs application to adopt has been abandoned. These are documents

that the Defendants should have had completed and filed with the embassy. Plaintiffs

immediately called, emailed, faxed and requested contact from Plaintiffs via their webpage.

Later in a telephone conversation with Defendant NH, the Plaintiffs were told that there

was **'a birth certificate problem that they had discovered in December."**

127.        It was during this conversation that the Defendants told the Plaintiffs Edgar

was no longer available for adoption. Plaintiffs were crushed emotionally. Yet, the

Defendants immediately offered another baby boy for the Plaintiffs. Defendants even

admitted having already filed a Power of Attorney in December (without the Plaintiff's

knowledge) for the Plaintiffs to adopt this little boy, who is named Yeferson.  Defendants

admitted that they hadn't told the Plaintiffs but were waiting for photos of the infant to

"soften the blow" of another failed adoption.

128.        On or about January 17, 2008, Plaintiffs told the Defendants how they felt

about the many lies, misconceptions and disappointments in their adoption services. (**See**

**Exhibit UU)**

129.        On or about January 21, 2008, Defendant NH told the Plaintiffs that they

will proceed with Daniel Edgar's adoption based on their belief that this is what Plaintiffs

desire.  But states that the case will likely run into problems with PGN due to birth

certificate problems, and that another attorney in Guatemala would need to be hired. Then in a moment of extreme cruelty, the Defendants tell the Plaintiffs that they will "**have to remove the other little boy from foster care since you aren't interested in him.**"

130.     On or about January 23, 2008, Plaintiffs demand to know where Edgar is located and what has been happened to him during the period when Defendants thought he was unable to be adopted. Plaintiffs are told they believe Edgar was returned to his birthmother.  Plaintiffs refuse to spend any more money on the adoption until such a time that both the US and Guatemalan government approves the adoption.

131.     On or about January 24, 2008, after a telephone conference call to discuss the many discrepancies and misrepresentations, the Plaintiffs tell the Defendants that they are not going to proceed with Daniel Edgar's adoption given Defendants statements that there are formidable obstacles with no guarantee of success, and the potential harm that would be inflicted on Daniel due to repeated moves between his birthmother and foster care. They state their plan to end their relationship with MS.  Despite being told often that Guatemala was the only country of choice for the Plaintiffs, Defendants offer the Plaintiffs children from other countries to adopt.

132.     In one more attempt to manipulate the Plaintiffs, the Defendants again remind the Plaintiffs about the 6 month old baby, Yeferson, for whom the Power of Attorney had been filed in December.  Plaintiffs agree to consider the baby one more time, and decide they feel some obligation to accept this referral, since due to the shut-down of new adoptions in Guatemala, this child will now either be adopted by them, or likely will live a life of poverty. Plaintiffs accepted the referral of Yeferson Edelmir Ramirez. They are

told that they should receive confirmation that this case can be registered with the new adoption authority within the week.

133.     By May 2008, after several problems getting information and after several weeks had elapsed, it became clear that the adoption of little Yeferson could not be completed by the Defendants and the Plaintiffs demanded a refund of $9,500, which constituted the second contracted payment sent to MS just a week or two before problems developed in the adoption of Daniel Edgar.

134.     The Plaintiffs were induced into adoptions that never took place due to the incompetence of the Defendants. Plaintiffs were induced into adoptions that Defendants never intended to complete through Defendants assurances, unethical behavior, lack of monitoring and misrepresentations. Plaintiffs have been damaged financially and emotionally by the Defendants illegal activities.

## DEFENDANT MAIN STREET ADOPTIONS
## SCHEME TO DEFRAUD

135.     Defendant MS has engaged in a scheme to defraud people seeking to become parents. The Defendant MS conducted this scheme to defraud through a system of offering children to the new parents and demanding a signed illusory contract and a wire of thousands of dollars.

136.     Through this scheme, the Defendant MS gathered money and requested wired payments for additional unspecified fees with the threat that if these fees aren't paid, the adoption will cease. Defendants MS, NH, BM and MD did almost all of their adoption business using the telephone, faxes and/or e-mail. Money was wired to bank accounts using telephone wires.

137.     Throughout the course of the process, the Defendant MS engaged in a series of fraudulent representations designed to induce the continued interest and to gain additional money from the parents.

138.     The Defendant MS is willing to engage in such brazenly criminal activity given the hyper-sensitive and vulnerable state of people who desperately want to be parents.

139.     Moreover, the Defendant MS faces little to no threat of civil action by the adoptive parents because of the constant threat of the Defendant MS stopping any adoption that is currently in the system.

140.     Once the Defendant MS had obtained the money from the prospective parents, the Defendant MS abruptly stopped communicating and informed the prospective parents that "they are too impatient" when they ask too many questions regarding the adoption process.

141.     Upon information and belief, Plaintiffs were victimized by the Defendant MS' scheme to defraud to the extent they relied upon the Defendant MS' fraudulent "factual" representations regarding the adoptions, birth mother or family returning for children, status of dossier, the MS attorneys and in-country coordinators involved in the adoptions and the status of the adoptions.

142.     Defendant MS began its scheme to defraud to the extent that they began presenting false information to the Plaintiffs and the MS clients. Plaintiffs succumbed to the Defendant MS' scheme to defraud and to the extent Plaintiffs relied on the Defendant MS' fraudulent representations that these adoptions would take place. The Defendant MS has refused to return money and personal property and continue to use these for its own

illegitimate benefit.   To this day, Plaintiffs continue to be so victimized by the Defendant MS' scheme to defraud.  *See supra* ¶¶ 14 –134.

143.     Upon information and belief, Plaintiffs allege that other unknown prospective parents have sustained and continue to sustain similar injuries by reason of the Defendant MS' scheme to defraud.

**<u>DEFENDANTS MS, NINA HELLER, BOB McCLENAGHAN AND<br>MARCIA DEL CARPIO'S SCHEMES TO<br>SOLICIT BRIBES, EXTORT  AND DEFRAUD</u>**

144.     Defendants MS, Nina Heller, Bob Clenaghan and Marcia Del Carpio have engaged in schemes to solicit bribes and extort money and property from prospective parents seeking to adopt children from Guatemala.   Defendants MS, Nina Heller, Bob Clenaghan and Marcia Del Carpio have conducted their scheme of bribe solicitation and extortion through enterprises consisting of their corporate entity and/or an association-in-fact enterprise consisting of the Corporate Defendant MS.

145.     Through their patterns of bribe solicitation and extortion, Defendants MS, Nina Heller, Bob Clenaghan and Marcia Del Carpio seek to wrongfully obtain money from prospective parents who are desperately hoping to adopt a child.

146.     Plaintiffs were victimized by the schemes of bribe solicitation and extortion of Defendants MS, Nina Heller, Bob Clenaghan and Marcia Del Carpio in that, Defendants MS, Nina Heller, Bob Clenaghan and Marcia Del Carpio caused the Plaintiffs to send money for adoptions that have not been completed, may not ever be completed or the money was sent due to the fear of Defendants MS, Nina Heller, Bob Clenaghan and Marcia Del Carpio preventing its completion.

147. Defendants MS, Nina Heller, Bob Clenaghan and Marcia Del Carpio's repeated schemes to defraud caused Plaintiffs to incur substantial expenses pursuing a dream of being parents that would never come to fruition unless Plaintiffs succumbed to the patterns of bribe solicitation, extortion or fraud.

148. Upon information and belief, Plaintiffs allege that other unknown prospective parents have sustained and continue to sustain similar injuries by reason of Defendants MS, Nina Heller, Bob Clenaghan and Marcia Del Carpio's schemes of bribe solicitation, extortion and mail/wire fraud.

## ACTS VIOLATING THE MAIL AND WIRE FRAUD STATUTES
## 18 U.S.C. §§ 1341, 1343

149. Pursuant to the events described in paragraphs 14 –134, *supra*, the Defendants MS, Nina Heller, Bob Clenaghan and Marcia Del Carpio knowingly devised or knowingly participated in the schemes or artifices to defraud Plaintiffs or to obtain the money or property of Plaintiffs by means of false or fraudulent pretenses, representations, or promises.

150. Pursuant to the events described in paragraphs 14 –134, *supra*, the Defendants MS, Nina Heller, Bob Clenaghan and Marcia Del Carpio could foresee that the mails would be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in or carrying out the schemes, within the meaning of 18 U.S.C. §§ 1341 and 1343. In particular, Defendants could foresee that the mails would be used to receive and/or deliver, *inter alia*, money and false or fraudulent representations regarding the adoptions, facilitators and the agreement among the parties; the status of ongoing adoptions and the remedies for problems with adoptions. Defendants

31

MS, Nina Heller, Bob Clenaghan and Marcia Del Carpio continued possession of Plaintiffs money and private information; gained through Defendants MS, Nina Heller, Bob Clenaghan and Marcia Del Carpio's bribe solicitation and extortionist demands.

151.    Defendants MS, Nina Heller, Bob Clenaghan and Marcia Del Carpio acting singly and in concert, personally or through their agents, as co-conspirators, or as aiders and abettors, used the mails or caused the mails to be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in, or carrying out the schemes, within the meaning of 18 U.S.C. §§ 1341 and 1343.

152.    In advancing, furthering, executing, concealing, conducting, participating in, or carrying out the schemes, the Defendants MS, Nina Heller, Bob Clenaghan and Marcia Del Carpio specifically used the wires/ mails or caused the wires/mails to be used to receive or deliver, *inter alia*, every email, facsimile, letter or telecommunication described in paragraphs 14 –134, *supra*.

153.    In advancing, furthering, executing, concealing, conducting, participating in, or carrying out the schemes, the Defendants MS, Nina Heller, Bob Clenaghan and Marcia Del Carpio also specifically used the wires/mails or caused the wires/mails to be used to receive or deliver, *inter alia*, the emails, facsimiles, letters or telecommunications with the Plaintiffs regarding all adoption matters.

154.    Each and every use of the mails and wires described above was committed by the Defendants MS, Nina Heller, Bob Clenaghan and Marcia Del Carpio with the specific intent to defraud Plaintiffs or for obtaining the money or property of Plaintiffs by means of false or fraudulent pretenses, representations, or promises.

155.   Defendants' acts of mail and wire fraud are in violation of 18 U.S.C. §§ 1341 and 1343 and constitute racketeering activity as defined by 18 U.S.C. § 1961(1)(B).


**COUNT ONE**

**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
18 U.S.C. § 1962(c)
(Defendant MS)**

156.   Plaintiffs re-allege paragraphs 1 through 155 as if restated herein.

157.   At all relevant times, some or all of the following individuals constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), in that they were "a group of individuals associated in fact":  Main Street Adoption Services LLP., Nina Heller, Bob Clenaghan and Marcia Del Carpio

   (a)   Main Street Adoption Services LLP, ("MS") is individually a "person," within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c), who associated with and/or participated in the conduct of said enterprise's affairs.

   (b)   From at least August 2006 and continuing through the present, the Defendant MS, personally or through their agent or agents, conducted, participated in, engaged in, conspired to engage in, or aided and abetted, the conduct of the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c).  The Defendant MS's pattern of racketeering activity consisted of:

(i)    a scheme to defraud (*see supra* ¶¶ 14 –134) that was knowingly and intentionally devised by the Defendant MS to obtain Plaintiffs money or property by means of false or fraudulent pretenses, representations, or promises; and, for the purpose of executing such scheme, the Defendants placed or caused to be placed in a post office, or authorized depository for mail, matter that furthered the scheme to defraud (including but not limited to the communications described in ¶¶14 –134); each Defendant committed mail fraud, in violation of 18 U.S.C § 1341, each time it used or caused the mails to be used to distribute the materials described in paragraphs 14 –158 and elsewhere;

(ii)   a scheme to defraud (*see supra* ¶¶ 14 –134) that was knowingly and intentionally devised by Defendant MS to obtain Plaintiffs money or property by means of false or fraudulent pretenses, representations, or promises; and, for the purpose of executing such scheme, the Defendant MS transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce matter that furthered the scheme to defraud (including but not limited to the communications described in ¶¶ 14 –134); each Defendant committed wire fraud, in violation of 18 U.S.C § 1343, each time it used or caused interstate wires to be used to distribute the materials described in paragraphs 14 –134 and elsewhere;

(iii)  receiving and/or possessing Plaintiffs property, in violation of 18 U.S.C. § 2315, valued at $5,000 or more, which crossed a state or international boundary after the Defendant MS stole, unlawfully converted, or took Plaintiffs property and which the Defendants knew was stolen, unlawfully converted, or taken (including but not limited to the events described in paragraphs 14 –134 and elsewhere);

(v)    transporting, transmitting, or transferring in interstate commerce any goods, wares, merchandise of the value of $5,000 or more, knowing the same to have been stolen converted or taken by fraud, each and every time that the Defendant MS caused Plaintiffs to transmit property across state or international

boundaries and each time that the Defendant MS transmitted Plaintiffs property to third-parties across state or international boundaries as (including but not limited to the events described in paragraphs 14 – 134), in violation of 18 U.S.C. § 2314.

These acts all occurred after the effective date of RICO and more than two such acts occurred within ten years of one another.

158.    At all relevant times, the enterprise alleged in paragraphs 14 –134 was engaged in, and its activities affected, interstate commerce and foreign commerce.

159.    All of the predicate acts described above were related so as to establish a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1962(c), in that their common purpose was to defraud Plaintiffs or other similar prospective adoptive parents of property or money; their common result was to defraud Plaintiffs or other similar prospective adoptive parents of property or money; the Defendant MS, through their agent or agents, directly or indirectly, participated in all of the acts and employed the same or similar methods of commission; Plaintiffs or other similar prospective adoptive parents were the victims of the fraudulent acts; and/or the acts were otherwise interrelated by distinguishing characteristics and were not isolated events.

160.    All of the predicate acts described above were continuous so as to form a pattern of racketeering activity in that:

a)    The Defendant MS engaged in the predicate acts described above over a substantial period of time (from at least August 2006 through the present); or

b)    The pattern of racketeering activity engaged in by the Defendant MS continues or threatens to continue because it

has become a regular way of conducting the Defendant MS's

on-going business activities.

161.     As a direct and result of, and by reason of, the activities of the Defendant

MS, and their conduct in violation of 18 U.S.C. §§ 1962(c), Plaintiffs have been injured in

their business or property, within the meaning of 18 U.S.C. § 1964(c).  Among other

things, Plaintiffs have suffered damages to the extent they invested time and resources in

pursuing what they thought and were led to believe was a legitimate international

adoption, to the extent their ability to adopt was delayed by the Defendant MS's wrongful

actions, and to the extent their property has been misappropriated.  Plaintiffs are,

therefore, entitled to recover threefold the damages that they have sustained together with

the cost of the suit, including reasonable attorneys' and experts' fees.


## COUNT TWO

### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### 18 U.S.C. § 1962(d)
### (Defendant Main Street Adoption Services, LLP )


162.     Plaintiffs re-allege paragraphs 1 through 161 as if restated herein.

163.     Defendant MS conspired with Defendants Nina Heller, Bob Clenaghan

and/or Marcia Del Carpio to conduct or participate, directly or indirectly, in the conduct

of the affairs of the enterprise through a pattern of racketeering activity (as described in

paragraphs 14 –134) in violation of 18 U.S.C. § 1962(d).  In particular, Defendant MS

intended to further an endeavor of Nina Heller, Bob Clenaghan and/or Marcia Del Carpio

which, if completed, would satisfy all of the elements of a substantive RICO criminal

offense and adopted the goal of furthering or facilitating the criminal endeavor.

164.     As a direct and proximate result of, and by reason of, the activities of the Defendant MS, and their conduct in violation of 18 U.S.C. §§ 1962(d), Plaintiffs have been injured in their business or property, within the meaning of 18 U.S.C. § 1964(c). Among other things, Plaintiffs have suffered damages to the extent they have invested time and resources in pursing what they thought and was led to believe was a legitimate international adoption opportunity with Defendant MS, to the extent their ability to complete the adoptions were delayed by the Defendant MS's wrongful actions, and to the extent their property has been misappropriated.  Plaintiffs are, therefore, entitled to recover threefold the damages that they have sustained together with the cost of the suit, including reasonable attorneys' and experts' fees.

## COUNT THREE

### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### 18 U.S.C. § 1962(c)
### (Defendants Nina Heller, Bob Clenaghan and Marcia Del Carpio)

165.     Plaintiffs re-allege paragraphs 1 through 164 as if restated herein.

166.     At all relevant times, MS constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), in that it was a corporation.

(a)     Nina Heller, Bob Clenaghan and/or Marcia Del Carpio are an individual "persons," within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c), who associated with and/or participated in the conduct of said enterprise's affairs.

(b)     For an unknown and indefinite period of time, Nina Heller,

Bob Clenaghan and/or Marcia Del Carpio have conducted,

participated in, engaged in, conspired to engage in, or aided

and abetted, the conduct of the affairs of the enterprise

through a pattern of racketeering activity within the meaning

of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c).  Nina Heller,

Bob Clenaghan and/or Marcia Del Carpio's pattern of

racketeering activity consisted of:

(i)     extortion (*see supra* ¶¶ 14 –134) that was designed to extract
direct or indirect personal rewards from Plaintiffs; if
Plaintiffs or another prospective adoptive refused to succumb
to Nina Heller, Bob Clenaghan and/or Marcia Del Carpio's
demands for money or foreign and administrative fees, they
would stop the adoption or adoption activities and prevent the
Plaintiffs from moving forward in the adoption, for personal
gain; all or some said acts of extortion were in violation of 18
U.S.C. § 1951;

(ii)    a scheme to defraud (*see supra* ¶¶ 14 –134) that was
knowingly and intentionally devised by Nina Heller,
Bob Clenaghan and/or Marcia Del Carpio to obtain
Plaintiffs money or property by means of false or
fraudulent pretenses, representations, or promises;
and, for the purpose of executing such scheme, Nina
Heller, Bob Clenaghan and/or Marcia Del Carpio
placed or caused to be placed in a post office, or
authorized depository for mail, matter that furthered
the scheme to defraud (including but not limited to
the communications described in ¶¶ 14 –134); Nina
Heller, Bob Clenaghan and/or Marcia Del Carpio
committed mail fraud, in violation of 18 U.S.C §
1341, each time they used or caused the mails to be
used to distribute the materials described in
paragraphs 14 –134 and elsewhere.

(iii)   a scheme to defraud (*see supra* ¶¶ 14 –134) that was
knowingly and intentionally devised by Nina Heller,
Bob Clenaghan and/or Marcia Del Carpio to obtain

Plaintiffs money or property by means of false or
fraudulent pretenses, representations, or promises;
and, for the purpose of executing such scheme, Nina
Heller, Bob Clenaghan and/or Marcia Del Carpio
transmitted or caused to be transmitted by means of
wire, radio, or television communication in interstate
or foreign commerce matter that furthered the scheme
to defraud (including but not limited to the
communications described in ¶¶ 14 –134); Nina
Heller, Bob Clenaghan and/or Marcia Del Carpio
committed wire fraud, in violation of 18 U.S.C §
1343, each time it used or caused interstate wires to
be used to distribute the materials described in
paragraphs 14 –134 and elsewhere;

(iv)     receiving and/or possessing Plaintiffs property, in
violation of 18 U.S.C. § 2315, valued at $5,000 or
more, which crossed a state or international boundary
after Nina Heller, Bob Clenaghan and/or Marcia Del
Carpio stole, unlawfully converted, or took Plaintiffs
property and which Nina Heller, Bob Clenaghan
and/or Marcia Del Carpio knew was stolen,
unlawfully converted, or taken (including but not
limited to the events described in paragraphs 14 –134
and elsewhere);

(v)      transporting, transmitting, or transferring in interstate
commerce any goods, wares, merchandise of the
value of $5,000 or more, knowing the same to have
been stolen converted or taken by fraud, each and
every time that Nina Heller, Bob Clenaghan and/or
Marcia Del Carpio Mitchell caused Plaintiffs to
transmit property across state or international
boundaries and each time that Nina Heller, Bob
Clenaghan and/or Marcia Del Carpio transmitted
Plaintiffs property to third-parties across state or
international boundaries as (including but not limited
to the events described in paragraphs 14 –134), in
violation of 18 U.S.C. § 2314;

(vi)     traveling in interstate and foreign commerce or using the mail
or any facility in interstate or foreign commerce with intent to
distribute the proceeds of extortion or otherwise promote,
manage, establish, or carry on a scheme to extort and
thereafter performed or attempted to perform said acts, in
violation of 18 U.S.C. § 1952.

These acts all occurred after the effective date of RICO and more than two such acts occurred within ten years of one another.

167.     In the alternative to paragraph 166, at all relevant times, some or all of the following individuals constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), in that they were "a group of individuals associated in fact": Main Street Adoption Services, LLP, Nina Heller, Bob Clenaghan and/or Marcia Del Carpio:

      (a)     Nina Heller, Bob Clenaghan and/or Marcia Del Carpio are each individual "persons," within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c), who associated with and/or participated in the conduct of said enterprise's affairs.

      (b)     For an unknown and indefinite period of time, Nina Heller, Bob Clenaghan and/or Marcia Del Carpio have conducted, participated in, engaged in, conspired to engage in, or aided and abetted, the conduct of the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c).  Nina Heller, Bob Clenaghan and/or Marcia Del Carpio's patterns of racketeering activity consisted of:

            (i)     extortion (*see supra* 14 –134) that was designed to extract direct or indirect personal rewards from Plaintiffs; if Plaintiffs or another prospective adoptive refused to succumb to Nina Heller, Bob Clenaghan and/or Marcia Del Carpio's demands for money or foreign and administrative fees, they would stop the adoption or adoption activities and prevent the Plaintiffs from moving forward in the adoption, for personal gain; all or some said acts of extortion were in violation of 18 U.S.C. § 1951;

(ii)     a scheme to defraud (*see supra* ¶¶ 14 –134) that was knowingly and intentionally devised by Nina Heller, Bob Clenaghan and/or Marcia Del Carpio to obtain Plaintiffs money or property by means of false or fraudulent pretenses, representations, or promises; and, for the purpose of executing such scheme, Nina Heller, Bob Clenaghan and/or Marcia Del Carpio placed or caused to be placed in a post office, or authorized depository for mail, matter that furthered the scheme to defraud (including but not limited to the communications described in ¶¶ 14 –134; Nina Heller, Bob Clenaghan and/or Marcia Del Carpio committed mail fraud, in violation of 18 U.S.C § 1341, each time they used or caused the mails to be used to distribute the materials described in paragraphs 14 –134 and elsewhere.

(iii)    a scheme to defraud (*see supra* ¶¶ 14 –134) that was knowingly and intentionally devised by Nina Heller, Bob Clenaghan and/or Marcia Del Carpio to obtain Plaintiffs money or property by means of false or fraudulent pretenses, representations, or promises; and, for the purpose of executing such scheme, Nina Heller, Bob Clenaghan and Marcia Del Carpio transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce matter that furthered the scheme to defraud (including but not limited to the communications described in ¶¶ 14 –134); Nina Heller, Bob Clenaghan and Marcia Del Carpio committed wire fraud, in violation of 18 U.S.C § 1343, each time it used or caused interstate wires to be used to distribute the materials described in paragraphs 14 –134 and elsewhere;

(iv)     receiving and/or possessing Plaintiffs property, in violation of 18 U.S.C. § 2315, valued at $5,000 or more, which crossed a state or international boundary after Nina Heller, Bob Clenaghan and/or Marcia Del Carpio stole, unlawfully converted, or took Plaintiffs property and which Nina Heller, Bob Clenaghan and/or Marcia Del Carpio knew was stolen, unlawfully converted, or taken (including but not limited to the events described in paragraphs 14 –134 and elsewhere);

41

     (v)     transporting, transmitting, or transferring in interstate commerce any goods, wares, merchandise of the value of $5,000 or more, knowing the same to have been stolen converted or taken by fraud, each and every time that Nina Heller, Bob Clenaghan and/or Marcia Del Carpio caused Plaintiffs to transmit property across state or international boundaries and each time that Nina Heller, Bob Clenaghan and/or Marcia Del Carpio transmitted Plaintiffs property to third-parties across state or international boundaries as (including but not limited to the events described in paragraphs 14 –134), in violation of 18 U.S.C. § 2314;

     (vi)    traveling in interstate and foreign commerce or using the mail or any facility in interstate or foreign commerce with intent to distribute the proceeds of extortion or otherwise promote, manage, establish, or carry on a scheme to extort and thereafter performed or attempted to perform said acts, in violation of 18 U.S.C. § 1952.

These acts all occurred after the effective date of RICO and more than two such acts occurred within ten years of one another.

168.    At all relevant times, the enterprises alleged in paragraphs 166-167 were engaged in, and their activities affected, interstate commerce and foreign commerce.

169.    All of the predicate acts described above were related so as to establish a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1962(c), in that their common purpose was to solicit bribes, extort and defraud Plaintiffs or other similar prospective adoptive parents of money or property; Nina Heller, Bob Clenaghan and/or Marcia Del Carpio each personally or through their agents or agents, directly or indirectly, participated in all of the acts and employed the same or similar methods of commission; Plaintiffs, other similar prospective adoptive parents, were the victims of the fraudulent

acts; and/or the acts were otherwise interrelated by distinguishing characteristics and were not isolated events.

170.    All of the predicate acts described above were continuous so as to form patterns of racketeering activity in that:

a)    Nina Heller, Bob Clenaghan and/or Marcia Del Carpio engaged in the predicate acts described above over a substantial period of time; or

b)    The patterns of racketeering activity engaged in by Nina Heller, Bob Clenaghan and/or Marcia Del Carpio continue or threaten to continue because the patterns have become a regular way of conducting Nina Heller, Bob Clenaghan and/or Marcia Del Carpio's on-going business activities (*see, e.g.*, ¶ 15, 21, 25, 31, 38, 43, 52, 54, 58, 76, 78, 83, 93, 100, 101, 120, 126, 129, 143).

171.    As a direct and result of, and by reason of, the activities of Nina Heller, Bob Clenaghan and/or Marcia Del Carpio, and their conduct in violation of 18 U.S.C. §§ 1962(c), Plaintiffs have been injured in its business or property, within the meaning of 18 U.S.C. § 1964(c).  Among other things, have suffered damages to the extent the Plaintiff invested time and resources in pursuing what they thought and were led to believe was a legitimate adoption opportunity with MS, to the extent its ability to complete adoptions and or facilitate adoptions was delayed by Nina Heller, Bob Clenaghan and/or Marcia Del Carpio's wrongful actions, and to the extent their property has been misappropriated.  Plaintiffs are, therefore, entitled to recover threefold the

damages they sustained together with the cost of the suit, including reasonable attorneys' and experts' fees.

## COUNT FOUR

**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**
**18 U.S.C. § 1962(d)**
**(Defendants MS, Nina Heller, Bob Clenaghan and/or Marcia Del Carpio)**

172.      Plaintiffs re-allege paragraphs 1 through 171 as if restated herein.

173.      MS conspired with Nina Heller, Bob Clenaghan and/or Marcia Del Carpio to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity (as described in paragraphs 166-167) in violation of 18 U.S.C. § 1962(d).  In particular, MS intended to further an endeavor of Nina Heller, Bob Clenaghan and/or Marcia Del Carpio which, if completed, would satisfy all of the elements of a substantive RICO criminal offense and adopted the goal of furthering or facilitating the criminal endeavor.

174.       Nina Heller conspired with MS, Bob Clenaghan and/or Marcia Del Carpio, to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity (as described in paragraphs 189-190) in violation of 18 U.S.C. § 1962(d). In particular, Nina Heller intended to further an endeavor of MS, Bob Clenaghan and/or Marcia Del Carpio which, if completed, would satisfy all of the elements of a substantive RICO criminal offense and adopted the goal of furthering or facilitating the criminal endeavor. (*See supra*, *e.g,* ¶ 15, 21, 25, 31, 38, 43, 52, 54, 58, 76, 78, 83, 93, 100, 101, 120, 126, 129, 143).

175.      Bob Clenaghan conspired with MS, Nina Heller and/or Marcia Del Carpio to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprise

through a pattern of racketeering activity (as described in paragraphs 189-190 in violation of 18 U.S.C. § 1962(d). In particular, Bob Clenaghan intended to further an endeavor of MS, Nina Heller and/or Marcia Del Carpio which, if completed, would satisfy all of the elements of a substantive RICO criminal offense and adopted the goal of furthering or facilitating the criminal endeavor. (*See supra*, *e.g,* ¶ 15, 21, 25, 31, 38, 43, 52, 54, 58, 76, 78, 83, 93, 100, 101, 120, 126, 129, 143).

176.     Marcia Del Carpio conspired with MS, Nina Heller and/or bob Clenaghan to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity (as described in paragraphs 189-190 in violation of 18 U.S.C. § 1962(d). In particular, Marcia Del Carpio intended to further an endeavor of MS, Nina Heller and/or Bob Clenaghan which, if completed, would satisfy all of the elements of a substantive RICO criminal offense and adopted the goal of furthering or facilitating the criminal endeavor. (*See supra*, *e.g,* ¶ 15, 21, 25, 31, 38, 43, 52, 54, 58, 76, 78, 83, 93, 100, 101, 120, 126, 129, 143).

177.     As a direct and proximate result of, and by reason of, the activities of MS, Nina Heller, Bob Clenaghan and/or Marcia Del Carpio, and their conduct in violation of 18 U.S.C. §§ 1962(d), Plaintiffs have been injured in their business or property, within the meaning of 18 U.S.C. § 1964(c).  Among other things, Plaintiffs have suffered damages to the extent they invested time and resources in pursing what they thought and were led to believe was a legitimate adoption opportunity with MS, to the extent the ability to complete adoptions and or facilitate Guatemalan adoptions were delayed by MS, Nina Heller, Bob Clenaghan and/or Marcia Del Carpio's wrongful actions, and to the extent their property has been misappropriated.  Plaintiffs are, therefore, entitled to recover

threefold the damages that they have sustained together with the cost of the suit, including reasonable attorneys' and experts' fees.

## COUNT FIVE

### UNJUST ENRICHMENT
### (Defendants MS, Nina Heller, Bob Clenaghan and/or Marcia Del Carpio)

178.     Plaintiffs re-allege paragraphs 1 through 177 as if restated herein.

179.     Defendants MS, Nina Heller, Bob Clenaghan and/or Marcia Del Carpio have, directly or indirectly, wrongfully received all or part of Plaintiffs property and money related to the adoptions.

180.     Despite Plaintiff's repeated requests, Defendants MS, Nina Heller, Bob Clenaghan and/or Marcia Del Carpio have refused to fully compensate Plaintiffs for the value of the property and money related to the adoptions received.

181.     As a result, MS, Nina Heller, Bob Clenaghan and/or Marcia Del Carpio have been unjustly enriched.

182.     By reason of the foregoing, and as a direct and proximate result, Plaintiffs are entitled to a judgment in an amount to be determined by the Court, but which is in excess of seventy-five thousand ($75,000).

## COUNT SIX

### CONVERSION
### (Defendants MS, Nina Heller, Bob Clenaghan and/or Marcia Del Carpio)

183.     Plaintiffs re-allege paragraphs 1 through 182 as if restated herein.

184.     Defendants MS, Nina Heller, Bob Clenaghan and/or Marcia Del Carpio have converted to their own use and benefit Plaintiffs property and money related to the adoptions.

185.     As a direct and proximate result of Defendants MS, Nina Heller, Bob Clenaghan and/or Marcia Del Carpio's conversion of Plaintiffs assets, Plaintiffs have incurred and/or will continue to incur substantial damages in an amount to be determined by the Court, but which is in excess of  seventy-five thousand ($75,000).

## COUNT SEVEN

### CIVIL CONSPIRACY
### (Defendants MS, Nina Heller, Bob Clenaghan and/or Marcia Del Carpio)

186.     Plaintiffs re-allege paragraphs 1 through 185 as if restated herein.

187.     Defendants MS, Nina Heller, Bob Clenaghan and/or Marcia Del Carpio illegally, maliciously, and wrongfully conspired with one another with the intent to and for the illegal purpose of committing fraudulent adoptions through a **bait and switch scheme**, an adoption scheme that offered illusory promises and conversion of the money and property of the Plaintiffs.

188.     Defendants MS, Nina Heller, Bob Clenaghan and/or Marcia Del Carpio, in combination, conspired to obtain money through their fraudulent adoption schemes.

189.     This conspiracy resulted in the illegal, unlawful, or tortious activity of fraud and violations of the Racketeer Influenced and Corrupt Organizations Act.

190.     As a result of the conspiracy and Defendant MS, Nina Heller, Bob Clenaghan and/or Marcia Del Carpio's illegal, wrongful, or tortious acts, Plaintiffs sustained the following damages: loss of money for adoptions, administrative fees,

translation fees, travel fees, lodging costs, fees for hiring adoption facilitators, foreign fees, loss of employment and housing, emotional damages and other damages that may have yet to be determined.

191.     As a direct and proximate result of Defendants MS, Nina Heller, Bob Clenaghan and/or Marcia Del Carpio's conspiracy to obtain Plaintiff's assets, Plaintiffs have incurred and/or will continue to incur substantial damages in an amount to be determined by the Court, but which is in excess of  seventy-five thousand ($75,000).

## COUNT EIGHT

### FRAUDULENT MISREPRESENTATION
### (Defendants MS, Nina Heller, Bob Clenaghan and Marcia Del Carpio)

192.     Plaintiffs re-allege paragraphs 1 through 191 as if restated herein.

193.     Defendants MS, Nina Heller, Bob Clenaghan and/or Marcia Del Carpio intentionally made false representations of material facts to Plaintiffs regarding the success of the adoptions, the ability of selecting a child from photo listings, the ability of the Defendants to "hold" a child for adoption, the ability of Defendants to complete adoptions due to their relationship with Guatemalan officials, the cost of services, the availability of children available to adopt, as set forth in the preceding paragraphs.

194.     Defendants MS, Nina Heller, Bob Clenaghan and/or Marcia Del Carpio's representations were false when they were made.

195.     Defendants MS, Nina Heller, Bob Clenaghan and/or Marcia Del Carpio knew that the representations were false when they were made or made them recklessly, without knowing whether they were true.

196.     Defendants MS, Nina Heller, Bob Clenaghan and/or Marcia Del Carpio intended that Plaintiffs rely on the representations.

197.     Plaintiffs relied on Defendant's false representations by signing an illusory Adoption Contract in the hopes of adopting a child.

198.     As a direct and proximate result of Defendants MS, Nina Heller, Bob Clenaghan and/or Marcia Del Carpio's fraudulent misrepresentation, Plaintiffs have incurred and/or will continue to incur substantial damages in an amount to be determined by the Court, but which is in excess of  seventy-five thousand ($75,000).

## COUNT NINE

### INNOCENT MISREPRESENTATION
### (Defendants MS, Nina Heller, Bob Clenaghan and Marcia Del Carpio)

199.     Plaintiffs re-allege and restate paragraphs 1 through 198 as if restated herein.

200.     Defendants MS, Nina Heller, Bob Clenaghan and/or Marcia Del Carpio's representations, as set forth in the preceding paragraphs, were made in connection with the making of a contract between Plaintiffs and Defendants MS, Nina Heller, Bob Clenaghan and/or Marcia Del Carpio.

201.     Plaintiffs would not have entered into the contract to adopt a Guatemalan child if Defendants MS, Nina Heller, Bob Clenaghan and/or Marcia Del Carpio had not made the representations.

202.     Plaintiffs suffered substantial economic losses as a result of entering into the contract, and these losses benefited Defendants MS, Nina Heller, Bob Clenaghan and/or Marcia Del Carpio.

203.     As a direct and proximate result of Defendants MS, Nina Heller, Bob Clenaghan and/or Marcia Del Carpio's fraudulent misrepresentation, Plaintiffs have incurred and/or will continue to incur substantial damages in an amount to be determined by the Court, but which is in excess of seventy-five thousand ($75,000).

## COUNT TEN

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### ( Defendants MS, Nina Heller, Bob Clenaghan and Marcia Del Carpio)

204.     Plaintiffs re-allege paragraphs 1 through 203 as if restated herein.

205.     Defendants MS, Nina Heller, Bob Clenaghan and/or Marcia Del Carpio's fraudulent representations and illegal activities were made intentionally, outrageously and maliciously and have caused Plaintiffs to suffer humiliation, outrage, indignation, sleepless nights, and severe emotional distress.

206.     Defendants MS, Nina Heller, Bob Clenaghan and/or Marcia Del Carpio continued in their enterprise of fraudulent behavior with reckless disregard to the emotional impact to the Plaintiffs.

207.     As a direct and proximate result of Defendants MS, Nina Heller, Bob Clenaghan and/or Marcia Del Carpio's Intentional Infliction of Emotional Distress, Plaintiffs have incurred and/or will continue to incur emotional distress and substantial damages in an amount to be determined by the Court, but which is in excess of seventy-five thousand ($75,000).

## COUNT ELEVEN

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (Defendants MS, Nina Heller, Bob Clenaghan and/or Marcia Del Carpio)

208.     Plaintiffs re-allege paragraphs 1 through 207 as if restated herein.

209.      Defendants MS, Nina Heller, Bob Clenaghan and/or Marcia Del Carpio's fraudulent representations and illegal activities were made intentionally, outrageously and maliciously and have caused Plaintiffs to suffer humiliation, outrage, indignation, sleepless nights, and severe emotional distress.

210.      Defendants MS, Nina Heller, Bob Clenaghan and/or Marcia Del Carpio continued in their enterprise of fraudulent behavior with reckless disregard to the emotional impact to the Plaintiffs and their spouses or partners.

211.      As a direct and proximate result of Defendants MS, Nina Heller, Bob Clenaghan and/or Marcia Del Carpio's Negligent Infliction of Emotional Distress, Plaintiff's spouses and family members have incurred and/or will continue to emotional distress and substantial damages in an amount to be determined by the Court, but which is in excess of seventy-five thousand ($75,000).

**WHEREFORE**, Plaintiffs demand judgment from the Court as follows:

1.      To award damages against Defendants MS, Nina Heller, Bob Clenaghan and Marcia Del Carpio, jointly and severally, for a sum of money equal to the amount of damages and/or losses Plaintiffs have sustained or will sustain;

2.      To treble the amount of said damages pursuant to 18 U.S.C. § 1964(c);

3.      To award prejudgment interest on the amount of damages and/or losses that Plaintiffs have sustained;

4.      To award all costs of litigation incurred by Plaintiffs, including their reasonable attorneys' fees and experts' fees, pursuant to 18 U.S.C. § 1964(c), ; and

5.     To award damages in an amount in excess of $75,000 resulting

from Defendant's intentional and malicious actions;

6.     And to award such other and further relief as the Court deems just

and equitable.

**FIXEL LAW OFFICES, PLLC**

Dated: June 6, 201                    /s/_____
                                      **Joni M. Fixel, Esquire**
                                      4084 Okemos Rd, Suite B
                                      Okemos, MI  48864
                                      Telephone:  (517) 332-3390
                                      Facsimile:  (517) 853-0434
                                      jfixel@fixellawoffices.com

                                      ***/s/  John S. Tucci  Jr., Esquire***
                                      ***John S. Tucci Jr., Esquire***
                                      Marshall, Dennehey, Warner,
                                      Coleman & Goggin
                                      1845 Walnut Street, 21st Floor
                                      Philadelphia, PA 19103
                                      jstucci@mdwcg.com
                                      Tel:215/575-2616
                                      Fax: 215/575-0856

**Jury Demand**

**Plaintiffs demand a Jury Trial.**

**FIXEL LAW OFFICES, PLLC**

Dated: June 6, 2011

//s/ _____

**Joni M. Fixel, Esquire**
4084 Okemos Rd, Suite B
Okemos, MI  48864
Telephone:  (517) 332-3390
Facsimile:  (517) 853-0434
jfixel@fixellawoffices.com

*/s/  John S. Tucci  Jr., Esquire*
*John S. Tucci Jr., Esquire*
Marshall, Dennehey, Warner,
Coleman & Goggin
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
jstucci@mdwcg.com
Tel:215/575-2616
Fax: 215/575-0856