## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GUY TURI et al,                                   :
                   **Plaintiffs,**           :
      **v.**                                         :
                             :   **CIVIL ACTION**
                             :
**MAIN STREET ADOPTION SERVICES,**   :   **NO. 11-03761**
**LLP, et al,**                                   :
                             :
             **Defendants.**           :
                             :

## MEMORANDUM OPINION

**Tucker, J.**                                              **September __, 2012**

       Presently before the Court are two motions to dismiss Plaintiff's Complaint pursuant to

Fed. R. Civ. P. 9(b), 12(b)(2), and 12(b)(6) from Defendants Heller and McClenaghan (Doc. 15)

and Defendant DelCarpio (Doc. 20).  Also for consideration are Plaintiffs' two responses to the

aforementioned motions (Docs. 19 & 22).  Upon consideration of the parties' motions with

briefs and exhibits, and for the reasons set forth below, Defendants' motions will be granted in

part and denied in part.

## I.  PROCEDURAL HISTORY

       Plaintiffs, along with another plaintiff couple from Michigan, originally filed a complaint

against these Defendants in the United States District Court for the Eastern District of Michigan

on October 22, 2008.  On September 9, 2009, this action was dismissed as to the Plaintiffs in the

instant action due to that court's lack of personal jurisdiction over the Defendants. See Turi v.

Main St. Adoption Services, LLP, 08-14511, 2009 WL 2923248 (E.D. Mich. Sept. 9, 2009).

Plaintiffs did not file a cross-appeal after this dismissal. See Turi v. Main Street Adoption

1

Services, LLP, 633 F.3d 496, 505 (6th Cir. 2011).

Plaintiffs, without the plaintiff couple from Michigan, filed the instant civil action against the Defendants on June 7, 2011 (Doc. 1).  Defendants Heller and McClenaghan moved for dismissal of the Complaint pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6) on September 9, 2011 (Doc. 20).  Defendant DelCarpio filed an answer to the Complaint on September 9, 2011 (Doc. 14), followed by a motion to dismiss the Complaint pursuant to Fed. R. Civ. P. 9(b), 12(b)(2),[1] and 12(b)(6) on September 30, 2011 (Doc. 20).

Collectively, the Plaintiff couples allege the following counts:

**Count I:**      **Violation of Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c), against Main Street**

**Count II:**      **Violation of RICO, 18 U.S.C. § 1962(d), against Main Street**

**Count III:**      **Violation of RICO, 18 U.S.C. § 1962(c), against the individual defendants**

**Count IV:**      **Violation of RICO, 18 U.S.C. § 1962(d), against all defendants**

**Count V:**      **Unjust enrichment, against all defendants**

**Count VI:**      **Conversion, against all defendants**

**Count VII:**      **Civil Conspiracy, against all defendants**

**Count VIII:**      **Fraudulent Misrepresentation, against all defendants**

**Count IX:**      **Innocent Misrepresentation, against all defendants**

**Count X:**      **Intentional Infliction of Emotional Distress, against all defendants**

**Count XI:**      **Negligent Infliction of Emotional Distress, against all defendants**

---

[1] Defendant DelCarpio's Motion to Dismiss states that her motion is made pursuant to "Federal Rules of Civil Procedure 9(b), 12(b)(1) & (6)" (Doc. 20).  Fed. R. Civ. P. 12(b)(1) permits a defense of lack of subject matter jurisdiction to be asserted.  However, it appears from the content of the motion that Defendant DelCarpio intended to assert a defense under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction.

## II.  <u>FACTUAL BACKGROUND</u> [2]

The Plaintiffs are five couples who allege that they paid money to the Defendants to assist in arranging adoptions of children from Guatemala.  However, Plaintiffs aver they were cheated out of the fees paid based on false representations concerning the availability of the children and the likelihood of completing the adoptions.

Defendant Main Street Adoption Services, LLP, is or was a Pennsylvania organization with its principal place of business in Lancaster, Pennsylvania.[3]  Defendant Nina Heller is or was the CEO, president, and director of Main Street and resided in Pennsylvania during the events in question.[4]  Defendant Bob McClenaghan is or was the executive director of Main Street and resides in Pennsylvania.  Defendant Marcia Milagro DelCarpio is a resident of Florida; she has or had an informal agreement with Main Street to perform adoption-related services as an independent contractor.  Defendant DelCarpio is alleged to have held herself out to be an expert in Guatemalan adoptions.

According to the Complaint, the Plaintiffs all became acquainted with the Defendants through an internet adoption site, http://www.precious.org.  The Plaintiff couples allege the following:

### A.  **Guy Turi and Melissa Balistreri-Turi**

Plaintiffs Guy Turi and Melissa Balistreri-Turi, residents of Illinois, indicated an interest in a child, Gilda, they saw on the website on February 28, 2007.  However, they were informed

---

[2] The facts, which are taken from the Complaint, are viewed in the light most favorable to the Plaintiffs as the non-moving party.  The Complaint includes a lengthy recital of the experiences each of the Plaintiff couples had with the Defendants.  The following is just an overview of those alleged interactions.

[3] According to Defendants Heller and McClenaghan, Main Street is no longer in operation.

[4] It appears, from the Plaintiffs' response to Defendant DelCarpio's motion to dismiss, that Defendant Heller currently resides in California.

by Heller that the child was taken. Five weeks later, on April 6, 2007, Heller contacted the Turis via e-mail and asked if they would be interested in another child, Madeline. The Turis agreed, paid over $12,500 in fees, and traveled to Guatemala in July 2007 to meet the child. While in Guatemala, the Turis came into contact with DelCarpio, who was designated as the facilitator of the adoption by Heller. They were then told that the child was no longer available, but were offered another child by DelCarpio.  The Turis refused.  However, on or about July 26, 2007, the Defendants asked whether the Turis would consider meeting another child, Maite.[5]  They agreed, and met Maite, whom they were told was available for adoption.

After returning to the United States, the Turis allege Heller discouraged them from accepting Maite and offered to "obtain" a younger girl for them.  The Turis refused, and tried to proceed with adopting Maite.  On or about October 4, 2007, the Turis were asked to pay DNA testing and foster care fees for Maite, which they did.  On or about January 15, 2008, the Turis were advised that the adoption could not proceed because the birth father had put his name on the child's birth certificate on October 30, 2007.  By this time, the Turis had paid over $25,000 to the Defendants.  Defendants then made assurances that they were working on adoptions for both Madeline (who, apparently, was now again available for adoption) and Maite.  Nothing came of either attempted adoption.

**B.**   **Shaun Nugent and Christine Denton**

On or about November 4, 2006, Shaun Nugent and Christine Denton, residents of Minnesota, contacted the Defendants about two siblings, Julian and Estella, they saw on the website. After the couple completed a home study and other administrative requirements, Heller e-mailed Nugent and Denton information on how much money to wire Main Street. In December

---

[5] It is unclear from the Complaint whether this was the same child previously offered by DelCarpio.

2006, the Defendants e-mailed Nugent and Denton telling them that the children they originally desired were no longer adoptable because the birth mother refused a DNA test.

Defendants informed Nugent and Denton that they were unable to refund the money the couple had deposited. However, Defendants stated the money could be applied toward another adoption in Guatemala. In January 2007, Heller notified Nugent and Denton of another child that was a possible match, Maria. Nugent and Denton undertook steps to complete the adoption, flying to Guatemala on March 31, 2007. Controversy then arose as to who was the child's real birth mother and whether the child was, in fact, legally adoptable.

Denton remained in Guatemala for over a year in order to facilitate the adoption process, while Nugent travelled back and forth between the United States and Guatemala to attend court appointments. Though it is unclear from the Complaint, it appears Nugent and Denton were ultimately able to complete the adoption of Maria after they hired their own attorney in Guatemala. The couple claims damages well in excess of $170,000.

### C. Sam and Lisa Wells

Lisa and Sam Wells, residents of Louisiana, allege that they contacted Heller via e-mail in August 2007 about adopting a child, Kimberly, from Guatemala. After several e-mail exchanges, the Wells paid $6,000 to cover DNA expenses, but the DNA test was not completed as promised. Heller informed the Wells the mother could not be located, and therefore a DNA test could not be performed. Heller then informed the Wells that a set of twins was available for adoption. The Wells sought to go to another agency but were promised by McClenaghan that Main Street's fees were the lowest. At some point the Wells began working with DelCarpio. In December 2007, the Wells worked with DelCarpio to adopt one of the twins. This apparently fell through when DelCarpio demanded money to facilitate the adoption of Kimberly, the first

child the Wells were initially interested in.

In February 2008, the Wells began working with a pediatrician named Dr. Rubio to complete the adoption of yet another child, Emma Leann. In the meantime, however, Main Street apparently continued processing the adoption of Kimberly. When the Wells refused to work with Main Street, McClenaghan filed a complaint with the United States embassy. Ultimately, a dispute arose between Dr. Rubio, DelCarpio, and McClenaghan. Dr. Rubio then refused to continue working with the Wells. At the time the Complaint was filed, the Wells had been unable to complete the adoption of Emma Leann with the assistance of Dr. Rubio.

### D. Linda and George Wood

Linda and George Wood, residents of Illinois, allege that on or about January 18, 2007 they identified a child, Joseline, on www.precious.org that they were interested in adopting. The couple contacted Main Street and spoke at length about the process, indicating that they were wary to begin the adoption process because a previous experience had gone poorly. The Woods allege that after receiving many assurances from the Defendants, they agreed to contract with Main Street to complete the adoption. After a delay of about 11 months, it appeared that the adoption was going to be completed and McClenaghan demanded the final payment. However, despite Main Street's earlier claims that the birth mother had already signed the necessary documents and a DNA test had been completed, McClenaghan sent the Woods an e-mail that the mother had refused to sign the final document and could not be found.

On or about January 20, 2008, the Woods called DelCarpio, who was in Guatemala City at the time. DelCarpio allegedly told the Woods she happened to be meeting with the birth mother later that day and would call the Woods with an update. Later that day, DelCarpio translated a conversation with a woman who claimed to be Joseline's birth mother; the birth

6

mother stated that she wanted to keep the child and had been assured that she could change her mind anytime throughout the adoption process. The next day, Heller wrote to the Woods and offered to help them with a Ukrainian adoption. The Woods wrote back the next day, demanding that their fees spent to date (roughly $29,200) be refunded. Throughout February and March 2008, McClenaghan and Heller claimed to be working on the adoption of Joseline, trying to convince the birth mother to change her mind. When the Woods demanded answers in March 2008, Heller offered to assist them with adoptions from a variety of other countries. The Woods were unable to complete an adoption through Main Street.

### E. Todd and Kelleen Urbon

Kelleen and Todd Urbon, residents of Illinois, had previously adopted internationally. On or about May 23, 2007, with this experience in hand, the Urbons contacted Main Street to inquire about a boy they saw on the website, Darwin. They were told Darwin was no longer available for adoption. On May 24, 2007, Heller e-mailed the Urbons several photographs of another child, Alexander. The Urbons were told that they needed to decide whether they were interested in Alexander, or he would be posted on www.precious.org. Heller allegedly informed the Urbons that the birth mother was cooperative and had surrendered Alexander and his two sisters. According to Heller, the sisters had already been matched with families in Pennsylvania and New Mexico, respectively.

On May 31, 2007 the Urbons accepted the match of Alexander. In August 2007, Heller informed the Urbons that Alexander's birth mother had taken all three children out of foster care and fled the area. In September 2007, the mother was found and jailed, but filed a petition to keep the children. By October 2007, Heller told the Urbons that she believed the adoption of Alexander would not proceed. Heller immediately offered the Urbons another child, whom they

rejected. When Heller offered yet another child, Daniel, the Urbons began the process all over again in November 2007. However, after the Urbons wired Main Street an additional $12,000 on or about December 2, 2007, the United States embassy notified them that there was a problem with Daniel's birth certificate. In the meantime, the Defendants had filed a power of attorney on the Urbons' behalf without their knowledge in order to adopt another child, Yeferson. The Urbons felt obligated to pursue this adoption; however, this adoption also did not work out. By May 2008, the Urbons demanded a refund of $9,500, which constituted the second contractual payment they sent to Main Street. It does not appear that either adoption was completed, or that the Urbons had any portion of their money refunded.

### III. <u>STANDARD OF REVIEW</u>

**A. Motions to Dismiss Pursuant to Federal Rule 12(b)(2)**

A federal court sitting in diversity must conduct a two-step analysis to ascertain whether personal jurisdiction exists. First, the court must look to the forum state's long-arm statute to determine if personal jurisdiction is permitted over the defendant. Second, the court must determine whether the exercise of jurisdiction violates the Due Process Clause of the Fourteenth Amendment. <u>See</u> <u>IMO Indus., Inc. v. Kiekert AG</u>, 155 F.3d 254, 259 (3d Cir. 1998); <u>Vetrotex Certaineed Corp. v. Consolidated Fiber Glass Products Co.</u>, 75 F.3d 147, 150 (3d Cir. 1996).

Because Pennsylvania's long-arm statute permits the exercise of personal jurisdiction to the fullest limits of due process as determined under the Constitution of the United States, <u>see</u> 42 Pa. Cons. Stat. Ann. § 5322(b), federal law determines the parameters of this Court's in personam jurisdiction. <u>See</u> <u>Vetrotex Certainteed Corp.</u>, 75 F.3d at 150. The Fourteenth Amendment permits a state to exercise jurisdiction over an out-of-state defendant only where

"the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985) (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)). It is the burden of the plaintiff to prove that the defendant purposefully availed himself of the forum state. To satisfy this burden, "at no point may the plaintiff rely on the bare pleadings alone," but rather must sustain this burden "through sworn affidavits or other competent evidence." Time Share Vacation Club v. Atlantic Resorts. Ltd., 735 F.2d 61,66 n.9 (3d Cir. 1984); see also Patterson v. FBI, 893 F.2d 595, 603-04 (3d Cir. 1990).

To prove that the defendant has purposefully availed herself of the state, a plaintiff may rely upon a defendant's specific contacts with the forum state.  The burden to produce actual evidence of the defendant's contacts with the forum state rests on the plaintiff.  See Time Share, 735 F.2d at 66 and n.9 (3d Cir. 1984).  Personal jurisdiction pursuant to such contacts is known as specific jurisdiction. Specific jurisdiction is invoked when a claim is related to or arises of out the defendant's contacts with the forum. See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416 (1984); Dollar Sav. Bank v. First Sec. Bank of Utah, 746 F.2d 208, 211 (3d Cir. 1984).  A court must first determine whether the defendant had the minimum contacts with the forum necessary for the defendant to have "reasonably anticipate[d] being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980) (citations omitted). What constitutes minimum contacts varies with the "quality and nature of defendant's activity." Hanson, 357 U.S. at 253.  In assessing the sufficiency of minimum contacts for personal jurisdiction, the court must focus on the "relationship among the defendant, the forum, and the litigation." Keeton v. Hustler, 465 U.S. 770, 770 (1984). Otherwise stated, there must be at least "a single deliberate contact" with the forum state that relates to the cause of action.

9

United States Golf Ass'n v. United States Amateur Golf Ass'n, 690 F.Supp. 317, 320 (D.N.J. 1988). The unilateral acts of the plaintiff, however, will not amount to minimum contacts. Helicopteros, 466 U.S. at 414; Hanson, 257 U.S. at 253.

Assuming minimum contacts have been established, a court may inquire whether "the assertion of personal jurisdiction would comport with "fair play and substantial justice." Burger King, 471 U.S. at 476 (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 320 (1945)); see also Pennzoil Prod. Co. v. Colelli & Assoc. Inc., 149 F.3d 197, 201 (3d Cir.1998). For personal jurisdiction to comport with "fair play and substantial justice," it must be reasonable to require the defendant to defend the suit in the forum state. World-Wide Volkswagen, 444 U.S. at 292. To determine reasonableness, a court considers the following factors: the burden on the defendant; the forum state's interest in adjudicating the dispute; the plaintiff's interest in obtaining convenient and effective relief; the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering substantive social policies. Id.

If the plaintiff cannot establish specific jurisdiction, a court may exercise general jurisdiction over the defendant if the defendant has maintained "continuous and systematic" contacts with the forum state. Helicopteros, 466 U.S. at 416. To establish general jurisdiction the plaintiff "must show significantly more than mere minimum contacts" with the forum state. Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n, 819 F.2d 434, 437 (3d Cir.1987) (citations omitted). Moreover, the facts required to establish general jurisdiction must be "extensive and persuasive." Reliance Steel Prods. v. Watson. Ess. Marshall, 675 F.2d 587, 589 (3d Cir. 1982).

A particular defendant may be dismissed from a lawsuit if the court cannot assert

personal jurisdiction over the defendant pursuant to this standard.  See Fed. R. Civ. P. 12(b)(2).

**B.  Motions to Dismiss Pursuant to Federal Rule 9(b)**

Fed. R. Civ. P. 9(b) requires that in all averments of "fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  "The purpose of Rule 9(b) is to provide notice of the 'precise misconduct' with which defendants are charged" in order to give them an opportunity to respond meaningfully to a complaint, "and to prevent false or unsubstantiated charges." Rolo v. City Investing Co. Liquidating Trust, 155 F.3d 644, 658 (3d Cir. 1998) (quoting Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984)).  To satisfy Rule 9(b), a plaintiff must "plead with particularity the 'circumstances' of the alleged fraud." Id.  Rule 9(b) "requires plaintiffs to plead 'the who, what, when, where, and how: the first paragraph of any newspaper story.'" In re Advanta Corp. Sec. Litig., 180 F.3d 525, 534 (3d Cir. 1999) (quoting DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990)).  Plaintiffs need not, however, "plead the 'date, place or time of the fraud,' so long as they use an 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" Rolo, 155 F.3d at 658 (quoting Seville Indus. Mach., 742 F.2d at 791).  The Third Circuit has cautioned that courts should "apply the rule with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants." Id. at 658 (citing Christidis v. First Pennsylvania Mortg. Trust, 717 F.2d 96, 99 (3d Cir. 1983)).

**C.  Motions to Dismiss Pursuant to Federal Rule 12(b)(6)**

On a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil

Procedure 12(b)(6), the court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. See Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 (3d Cir. 1994). A complaint should be dismissed only if the alleged facts, taken as true, fail to state a claim. See In re Warfarin Sodium Antitrust Litig., 214 F.3d 395, 397-98 (3d Cir. 2000). The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Semerenko v. Cendant Corp., 223 F.3d 165, 173 (3d Cir. 2000).

While a court will accept well-pled allegations as true for the purposes of the motion, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997). The United States Supreme Court has recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (alteration in original). In Twombly, the Court made clear that it would not require a "heightened fact pleading of specifics," but only "enough facts to state a claim to relief that is plausible on its face." Id. at 570. A "pleader is required to 'set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.'" Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993) (citations omitted).

In 2009, the United States Supreme Court revisited the requirements for surviving a 12(b)(6) motion to dismiss in Ashcroft v. Iqbal, 556 U.S. 662 (2009). In Iqbal, the Court made

clear that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements [will] not suffice" to defeat a Rule 12(b)(6) motion to dismiss. Id. at 663. "[O]nly a complaint that states a plausible claim for relief [will] survive[] a motion to dismiss." Id. at 679.

In light of the decision in Iqbal, the Third Circuit set forth a two-part analysis to be applied by district courts when presented with a 12(b)(6) motion. First, the court must separate the legal elements and factual allegations of the claim, with the well-pleaded facts accepted as true but the legal conclusions disregarded. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009). Second, the court must determine whether the facts alleged in the complaint demonstrate that the plaintiff has a "plausible claim for relief." Id. at 211 (citation omitted). If the court can only infer the mere possibility of misconduct, the complaint must be dismissed because it has alleged, but has failed to show, that the pleader is entitled to relief. Id.

## IV. DISCUSSION

### A. This Court has Personal Jurisdiction Over Defendant DelCarpio Pursuant to Rule 12(b)(2)

Before addressing the merits of Defendant DelCarpio's argument that this Court lacks personal jurisdiction over her, this Court must consider the implications of DelCarpio filing her motion to dismiss (Doc. 20) *after* filing an answer (Doc. 14). Fed.R.Civ.P. 12(b) provides:

> Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion:…(2) lack of personal jurisdiction…A motion asserting any of these defenses must be made *before* pleading if a responsive pleading is allowed….

Fed.R.Civ.P. 12(b) (emphasis added). Thus, DelCarpio's failure to file her motion to dismiss prior to filing her answer renders the motion untimely. Many courts, however, treat

post-answer motions to dismiss as Rule 12(c) motions for judgment on the pleadings. See e.g. Turbe v. Gov't of the Virgin Islands, 938 F.2d 427, 428 (3d Cir.1991); MacDonald v. Grace Church Seattle, 457 F.3d 1079, 1081 (9th Cir.2006); Lanigan v. Village of East Hazel Crest, Ill., 110 F.3d 467, 470 (7th Cir.1997).  Defendant DelCarpio raised the defense of lack of personal jurisdiction and venue in her answer.  Therefore, the Court will treat DelCarpio's motion to dismiss as a motion for judgment on the pleadings, which is subject to the same standard of review as motions to dismiss. See Mele v. Fed. Reserve Bank of N.Y., 359 F.3d 251, 253 (3d Cir.2004).

At the outset, the Court notes that DelCarpio has previously raised the defense of lack of personal jurisdiction in her motion to dismiss before the Eastern District of Michigan.  There, the court engaged in extensive analysis of 18 U.S.C. § 1965, which Plaintiffs aver permits any court in the United States to exercise personal jurisdiction over any person complicit in a RICO enterprise once personal jurisdiction has been established over any of their co-conspirators. Section 1965(b) provides:

> In any action under section 1964 of this chapter in any district court of the United States in which it is shown that *the ends of justice require* that *other parties* residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

18 U.S.C. § 1965 (emphasis added).  There is no debate that this Court has jurisdiction over Defendants Heller and McClenaghan.  Indeed, neither Heller nor McClenaghan raised lack of personal jurisdiction in their separate motion to dismiss.  The Court finds that, under § 1965, its personal jurisdiction over Heller and McClenaghan establishes personal jurisdiction over their alleged co-conspirator, DelCarpio.  In reaching this conclusion, the Court notes that the Third

Circuit has not ruled on whether § 1965 creates personal nationwide personal jurisdiction.[6]

However, the Court finds the analysis the Eastern District of Michigan persuasive:

> The weight of authority and the majority of recent decisions…hold that section 1965 provides for national personal jurisdiction only if the court has personal jurisdiction over one of the defendants, and there is no other district in which a court has jurisdiction over all co-conspirators.

Turi v. Main St. Adoption Services, LLP, 08-14511, 2009 WL 2923248 at *16 (citing

Cory v. Aztec Steel Bldg., Inc., 468 F.3d 1226, 1231 (10th Cir.2006); PT United Can Co. Ltd. v.

Crown Cork & Seal Co., 138 F.3d 65, 70 (2d Cir.1998); Butcher's Union Local No. 498 v. SDC

Inv. Inc., 788 F.2d 535, 538 (9th Cir.1986)).  Further, the court also found:

> [Section] 1965(b) provides for nationwide service and jurisdiction over 'other parties' not residing in the district, who may be additional defendants of any kind, including co-defendants, third party defendants, or additional counter-claim defendants. This jurisdiction is not automatic but requires a showing that the 'ends of justice' so require. This is an unsurprising limitation. There is no impediment to prosecution of a civil RICO action in a court foreign to some defendants if it is necessary, but the first preference, as set forth in § 1965(a), is to bring the action where suits are normally expected to be brought. Congress has expressed a preference in § 1965 to avoid, where possible, ha[i]ling defendants into far flung fora.

Id. at *17. Thus, the question becomes whether the "ends of justice" require the

utilization of nationwide service of process to bring DelCarpio into this district.  This Court, like

the Eastern District of Michigan, finds that it does. See Id. at *18 ("In this case, the plaintiffs

---

[6] However, several district courts in the Third Circuit have. See e.g., Southmark Prime Plus, L.P. v. Falzone, 768 F. Supp. 487, 490 (D. Del. 1991) ("If venue is proper in a district pursuant to 18 U.S.C. § 1965(a) or 28 U.S.C. § 1391 as to one or more defendants, venue will also be proper with respect to defendants not covered by these venue provisions if, pursuant to 18 U.S.C. § 1965(b), the 'interests of justice' dictate that these other defendants be brought before the same court."); Shulton, Inc. v. Optel Corp., CIV.A. 85-2925, 1986 WL 15617 (D.N.J. Sept. 29, 1986) ("Generally, however, the ends of justice requirement is fulfilled when venue is properly laid in the district in question under section 1965(a) at least as to one defendant, and there exists no other district in which venue would be appropriate as to all defendants."); Farmers Bank of State of Del. v. Bell Mortg. Corp., 577 F. Supp. 34, 35 (D. Del. 1978) (holding § 1965(b) expresses the "desirability of having the whole action litigated in one court").

have alleged that DelCarpio is an equal participant in the RICO conspiracy with the Main Street

defendants. The complaint states a colorable claim under RICO, describing a scheme in which

the Main Street defendants dealt with the plaintiffs in the United States while DelCarpio

delivered funds—or not—'in country.' Because of RICO's remedial purpose, the Court finds that

the ends of justice favor the exercise of personal jurisdiction over DelCarpio with respect to the

counts of the complaint brought under RICO.")  The Plaintiffs and Defendants in this action are

all geographically diverse.  Furthermore, this action has already been dismissed from one district

court.  It is likely that there is no other court where this case could have been brought.  As stated

by Plaintiffs, the RICO statute essentially functions to allow a district court that can maintain

personal jurisdiction over one participant in the RICO scheme to hear all claims against all

participants.  Congress has made a policy choice that, when a plaintiff sues an allegedly corrupt,

multi-district organization, they should not have to sue each member in separate actions, based

on traditional minimum contracts jurisdictional analysis.  This amounts to a very specific

exception to the traditional analysis that is particular to RICO.

Accordingly, the Court finds that it has jurisdiction over Defendant DelCarpio pursuant

to 18 U.S.C. § 1965.

### B.  Plaintiffs Have Stated a Claim  under 18 U.S.C. § 1962(c)[7]

Plaintiffs claim that the Defendants' alleged conduct violated the Racketeer Influenced

and Correct Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d).  Claims alleging fraud,

including RICO claims based on predicate acts of mail or wire fraud, are subject to the higher

---

[7] DelCarpio also moved to dismiss the Complaint under Rules 9(b) and 12(b)(6).  In her answer, DelCarpio included a defense of failure to state a claim upon which relief can be granted.  The Court will once again treat DelCarpio's motion to dismiss as a motion for judgment on the pleadings.  DelCarpio's motion largely summarizes and parrots arguments more thoroughly advanced in Defendants Heller and McClenaghan's motion to dismiss.  As such, the Court will focus on the substance of Heller and McCleanaghan's motion.  However, all conclusions apply equally to DelCarpio's motion.

pleading standard of 9(b).  In order to satisfy Rule 9(b), plaintiffs must plead with particularity "the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." <u>Seville Indus. Mach.</u>, 742 F.2d at 791.  Plaintiffs may satisfy this requirement by pleading the "date, place or time" of the fraud, or through "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." <u>Id</u>.  Plaintiffs must also allege who made a misrepresentation to whom and the general content of the misrepresentation. <u>See</u> <u>Klein v. General Nutrition Co., Inc.</u>, 186 F.3d 338, 345 (3d Cir.1999); <u>Rolo v. City Investing Co. Liquidating Trust</u>, 155 F.3d 644, 658-59 (3d Cir.1998); <u>Saporito v. Combustion Eng'g Inc.</u>, 843 F.2d 666, 675 (3d Cir. 1988);

If the plaintiff fails to comply with Rule 9(b)'s pleading requirements, this is treated as a failure to state a claim under Rule 12(b)(6). <u>See</u> <u>Harrison v. Westinghouse Savannah River Co.</u>, 176 F.3d 776, 783 (4th Cir. 1999); <u>United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.</u>, 125 F.3d 899, 901 (5th Cir.1997).

### 1.  **Pattern of Racketeering Activity**

Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  To plead a RICO claim under § 1962(c), "the plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." <u>Lum v. Bank of Am.</u>, 361 F.3d 217, 223 (3d Cir.2004) (citing <u>Sedima, S.P.R.L. v. Imrex Co.</u>, 473 U.S. 479, 496 (1985)).

The Supreme Court has ruled that the "conduct" alleged must be related to the "operation

or management of the enterprise." <u>Reves v. Ernst & Young</u>, 507 U.S. 170, 179-80 (1993).

Further, according to the RICO statute, an "enterprise" includes "any individual, partnership,

corporation, association, or other legal entity, and any union or group of individuals associated in

fact although not a legal entity." 18 U.S.C. § 1961(4).  For purposes of their motion to dismiss,

Defendants Heller and McClenaghan "concede that Main Street was a legal entity capable of

being an enterprise under RICO, and that they did participate in [Main Street]'s operation and

management." (Doc. 15 at 10).  Therefore, Defendants Heller and McClenaghan focus on the last

two elements of a RICO claim that they assert have not been well-pleaded in the Complaint: the

pattern of racketeering activity. Accordingly, the Court will only address the last two elements.

### a.   Continuity

Defendants Heller and McClenaghan argue that Plaintiffs have failed to adequately plead

the continuity element of pattern of racketeering activity required to state a RICO claim.  The

Supreme Court has ruled that "continuity" is "both a closed- and open-ended concept."  <u>H.J. Inc.</u>

<u>v. Nw. Bell Tel. Co.</u>, 492 U.S. 229, 241 (1989) (citations omitted).  "A party alleging a RICO

violation may demonstrate continuity over a closed period by proving a series of related

predicates extending over a substantial period of time." <u>Id.</u> at 242.  Conversely, open-ended

patterns are more difficult to define, as the Defendants point out.  However, open-ended patterns

may be demonstrated "where it is shown that the predicates are a regular way of conducting

defendant's ongoing legitimate business…or of conducting or participating in an ongoing and

legitimate RICO 'enterprise.'" <u>Id.</u> at 243.  Thus, Defendants aver that Plaintiffs have not

sufficiently plead a closed-period pattern of racketeering (because the alleged conduct of the

Defendants does not cover a substantial period of time) or an open-ended pattern of racketeering

(because Main Street is no longer an ongoing business).  Plaintiffs emphasize that the continuity

18

element is a "fact intensive inquiry that is resistant to bright line tests like that advocated by Defendants' counsel." (Doc. 19 at 9, citing See Uniroyal Goodrich Tire Co. v. Mutual Trading Corp., 63 F.3d 516 (7th Cir. 1995)).

The Court finds that Plaintiffs' pleadings survive Defendants' motion to dismiss under either a closed- or open-ended continuity analysis.  Plaintiffs have alleged conduct which took place from 2007 to 2008 in the case of four of the couples (the Turis, the Wells, the Woods, and the Urbons) and from 2006 to 2008 in the case of Nugent and Denton.  Therefore, the alleged pattern of racketeering activity took place over a two year period.  This two year period is a sufficiently substantial period of time for purposes of alleging a closed-period pattern of racketeering activity.  Further, at this point in the litigation, it remains to be seen whether Main Street is, in fact, defunct and whether its agents are still involved in the adoption business.  Therefore, it is premature for Defendants to argue that Plaintiffs have failed to allege an ongoing pattern of racketeering activity.

### b.  Predicate Acts- Wire and Mail Fraud

Defendants Heller and McClenaghan next argue that Plaintiffs have failed to adequately plead the predicate acts required to state claims under RICO.  Specifically, Defendants contend Plaintiffs have failed to (1) plead facts alleging a "scheme or artifice to defraud" as required by the mail and wire fraud statutes, and (2) plead facts alleging Defendants committed extortion under 18 U.S.C. § 1951.

Under the RICO statute, a "pattern of racketeering activity" requires at least two acts of racketeering activity within a ten-year period. 18 U.S.C. § 1961(5).  These predicate acts of racketeering may include, *inter alia*, bribery, federal mail fraud under 18 U.S.C. § 1341, federal wire fraud under 18 U.S.C. § 1343, extortion under 18 U.S.C. § 1951, and interstate

transportation of stolen property under 18 US.C. §§ 2314 and 2315. See 18 U.S.C. § 1961(1) (defining "racketeering activity").  In particular, the mail and wire fraud statutes prohibit the use of the U.S. mails and wires for the purpose of executing any "scheme or artifice to defraud." Courts have interpreted the mail and wire fraud statutes similarly.  See In re Phillips Petroleum Sec. Litig., 881 F.2d 1236, 1249 (3d Cir. 1989)

Defendants advance three arguments: (1) the Complaint fails to specify *which* Defendant made specific representations or committed certain actions; (2) Defendants provide a lengthy recital of details they assert have *not* been adequately plead by Plaintiffs; (3) the contracts signed by the respective Plaintiff couples make clear that there was no scheme or artifice to defraud.

The Court does not find these arguments convincing.  First, the Court acknowledges that there are certain paragraphs in the Complaint that generally refer to conduct or representations made by "Defendants," without specifying which Defendant.  However, there are many more paragraphs in this rather lengthy Complaint that *do* state with particularity which Defendant the couples were interacting with at any given time.  Moreover, the Complaint contains 47 exhibits, which overwhelming consists of email exchanges between Heller, McClenaghan, and the Plaintiff couples. These emails, in turn, reference specific phone conversations, letters mailed, and other communications between the individual defendants and Plaintiffs.  The Court finds that, whatever deficiencies there may be in certain paragraphs of the Complaint, the Complaint and exhibits taken as a whole provide adequate notice to the Defendants of what representations they are alleged to have made and what misconduct they are alleged to have committed.

With respect to the second argument, Defendants Heller and McClenaghan argue that Plaintiffs have not sufficiently identified any representations the Defendants knew to be false or unfounded at the time they were made.  However, courts may allow plaintiffs extra leeway in

pleading when the necessary information is under the exclusive control of the defendant.  <u>See</u> <u>In</u> <u>re Rockefeller Ctr. Properties, Inc. Sec. Litig.</u>, 311 F.3d 198, 216 (3d Cir. 2002) ("Where it can be shown that the requisite factual information is peculiarly within the defendant's knowledge or control, the rigid requirements of Rule 9(b) may be relaxed.")  What Defendants knew and when they knew it is information undoubtedly within the exclusive control of the Defendants.

Further, the Court finds that Plaintiffs have sufficiently alleged a scheme to defraud.  The facts, as stated by Plaintiffs, evidence a common pattern of potentially deceptive behavior: The couples would view a child on the www.precious.org website.  The couples would eventually begin the process of adopting a child the Defendants purported to be available for adoption.  The adoption of this child would run into a variety of complications and delays.  As the complications and delays mounted (and the couples either demanded a refund or an accounting of how the fees they had paid were spent), the Defendants would make representations that encouraged the couples to continue with the process.  These representations often included offering other children up for adoption.  The Defendants would then request additional fees to continue the adoption process(es).  This cycle repeated itself.  However, except for Mr. Nugent and Ms. Denton, none of the couples were ultimately successful in adopting a child through Main Street and its agents.

Finally, the Court does not find the contracts signed the Plaintiff couples to be helpful in determining whether the allegations of the Complaint have been adequately plead.  The mere fact that the contracts disavow liability for any complications or delays that could occur during the adoption process does not answer the question of whether there could have been a scheme to defraud.  Indeed, Plaintiffs have argued that the Defendants would hide behind the language of the contracts whenever problems arose during the adoption process.  Defendants now seek to do

exactly the same thing for purposes of their motion to dismiss.

### c.   Predicate Acts- Extortion

Defendants Heller and McClenaghan further argue that Plaintiffs have failed to plead facts alleging Defendants committed extortion under 18 U.S.C. § 1951 ("the Hobbs Act").  The Hobbs Act defines extortion as "obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  18 U.S.C. § 1951(b)(2).  Defendants, citing Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 523 (3d Cir. 1998), argue that if a defendant has "lawful claim to the property obtained," there has been no extortion. Defendants further argue that if the plaintiff has not pleaded that he has a freestanding, pre-existing right to be free from the fear that he assuaged by transferring his property to the defendant, he has not made out a claim under the Hobbs Act. See id. at 525, 526.

The Court disagrees with the Defendants.  Here again, Defendants rely on the contracts signed by the Plaintiffs to support their contention that they were entitled to the fees paid by the Plaintiffs.  However, the contracts do not conclusively prove that the Defendants had a "lawful claim" to the additional fees paid to them.  On the contrary, it is fundamental to the Plaintiffs' claims that they paid the additional fees solicited by the Defendants—even when they did not believe they currently owed any fees under fee schedule delineated in the contracts or based on previous representations made by the Defendants—out of fear that the adoption process would not otherwise continue.  In other words, Defendants are alleged to have exploited the emotional and financial investment of these couples in order to extort additional fees from them, fees to which they did not have a lawful claim.  Thus, the Court finds that the Plaintiffs have adequately plead extortion.

**C.  Plaintiffs Have Stated a Claim under 18 U.S.C. § 1962(d)**

Section 1962(d) makes it unlawful "for any person to conspire to violate" § 1962(c).  A

RICO plaintiff who is able to sustain his burden of pleading a violation under § 1962(c) faces a

less onerous burden in pleading a related § 1962(d) violation:

> In order to state a claim under RICO subsection [1962](d), a plaintiff must allege (1)
> agreement to commit the predicate acts of fraud, and (2) knowledge that those acts were
> part of a pattern of racketeering activity conducted in such a way as to violate section
> 1962(a), (b), or (c). Allegations of conspiracy are not measured under the Fed.R.Civ.P.
> 9(b) standard, which requires greater particularity of allegation of fraud, but are
> measured under the more liberal Fed.R.Civ.P. 8(a) pleading standard. A conspiracy claim
> must also contain supportive factual allegations. The allegations must be sufficient to
> describe the general composition of the conspiracy, some or all of its broad objectives,
> and the defendant's general role in that conspiracy.

HT of Highlands Ranch, Inc. v. Hollywood Tanning Sys., Inc., 590 F. Supp. 2d 677, 690

(D.N.J. 2008) (citing Rose v. Bartle, 871 F.2d 331, 366 (3d Cir.1989)) (citations omitted).

Because the Court finds the Plaintiffs have stated a claim under §1962(c), it likewise

finds that the Plaintiffs have stated a claim under § 1962(d).  Accordingly, the Court will deny

Defendants' motion to dismiss Plaintiffs' claim for conspiracy to violate RICO under § 1962(d).

**D.  Counts Five though Eleven of the Complaint are Dismissed**

Defendants Heller and McClenaghan articulated a number of reasons why Counts 5 to 11

of the Complaint should be dismissed (Doc. 15 at 24-31).  Defendant DelCarpio reiterates these

reasons verbatim (Doc. 20 at 11-13).  Plaintiffs have conceded to the dismissal of these claims as

time barred by the applicable Pennsylvania statutes of limitations (Doc. 19 at 17).  Accordingly,

Counts V, VI, VII, VIII, IX, X, and XI of the Complaint are hereby dismissed with prejudiced.

**V.  CONCLUSION**

23

For the foregoing reasons, Defendants' Motions to Dismiss the Complaint will be granted with respect to Counts V, VI, VII, VIII, IX, X, and XI.  However, the Motions to Dismiss will be denied with respect to Plaintiffs' RICO claims (Counts I, II, III, and IV).

An appropriate order follows.